[No. G003181. Fourth Dist., Div. Three. Jan. 29, 1988.]

ALEXANDER PERUMAL et al., Minors, etc., Plaintiffs and Appellants, v.
SADDLEBACK VALLEY UNIFIED SCHOOL DISTRICT et al., Defendants and Respondents.

**COUNSEL**

David L. Llewellyn, Jr., for Plaintiffs and Appellants.

Rutan & Tucker, David C. Larsen and Leonard P. Swyer for Defendants and Respondents.

**OPINION**

**SONENSHINE, J.**—Alexander Perumal and Frederick Read appeal from a judgment denying a petition for writ of mandate seeking an order of the court directing Saddleback Valley Unified School District to allow distribution of a religious club's flyers on the district's high school campuses

and to compel publication of the club's advertisement in a high school yearbook.

## I

During the 1984-1985 school year, Alexander Perumal, a student at El Toro High School, and Frederick Read, a student at Mission Viejo High School, were members of student groups known as "New Life." The groups were organized to provide a forum for students to engage in Bible study and prayer during school. The students talked informally outside in groups of five to twenty-five during the lunch hour. The school's principals and the school district were aware of the meetings, but did not object.[1]

In February 1985, in a written request to El Toro's principal, Perumal sought approval to distribute a flyer announcing the meetings. His request was denied. Read made a similar request to his principal and received the same response. Read also submitted an advertisement for the meetings which he asked be placed in the Mission Viejo High School yearbook. It was also rejected.[2]

Perumal and Read filed a petition for writ of mandate in superior court. They sought an order directing Saddleback Valley Unified School District to permit distribution of the New Life flyers at their high schools and to

[1] Saddleback Valley Unified School District had previously allowed its high schools to sponsor religious student clubs such as New Life. But, as a result of parental complaints and county counsel opinions, the district, in March 1981, withdrew its official recognition. The students were permitted to continue meeting during the school day in classrooms and to advertise their meetings as unofficial organizations. In April 1981, a lawsuit was filed against the district seeking to prevent the groups from operating at the schools.

The members of the New Life club were informed they could no longer formally meet; only school-sponsored clubs were permitted to do so. They were told they could meet informally by eating lunch together and could discuss whatever they wished. Small groups of students at El Toro and Mission Viejo High Schools immediately began to conduct informal Bible studies during their lunch period.

In 1984, Perumal and Read attempted to reestablish formal New Life clubs at their respective schools pursuant to the Federal Equal Access Act of 1984. (20 U.S.C. § 4071 et seq.) Perumal and Read, presenting themselves as presidents of the New Life clubs at their respective high schools, appeared before school board meetings. With the support of a citizens' Christian Evangelical group, Perumal and Read contended the district permitted other noncurriculum related clubs to meet and the district could not prevent them from doing the same. The district denied the requests.

Perumal and Read then requested the district to consider modifying the existing policy by creating a limited open forum so the New Life clubs could formally operate. After hearing extensive public debate on the matter, including statements from Perumal and Read, the district decided the existing policy should remain unchanged.

[2] The flyer and yearbook advertisement are reproduced in the margin. (See appen., pp. 95-97.)

compel the publication of Read's New Life yearbook advertisement. Their petition was denied without comment.

## II

Must a tax-supported high school district board, which has adopted a closed-forum policy, allow a student club to distribute religious flyers on the school campus during school hours or to place religious advertisements in a high school yearbook? In answering these questions, we look to the state and federal constitutions and relevant statutory and case authority.

"The First Amendment of the United States Constitution decrees, 'Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . . .' [¶] The Amendment is made applicable to the states through the Fourteenth Amendment (*Abington School Dist.* v. *Schempp* (1963) 374 U.S. 203, 215 [10 L.Ed.2d 844, 854, 83 S.Ct. 1560]). [¶] California's Constitution, however, in provisions not dependent upon the federal Constitution (Cal. Const., art. I, §§ 4, 24,) expresses the same sentiments: 'Free exercise and enjoyment of religion without discrimination or preference are guaranteed. . . . The Legislature shall make no law respecting an establishment of religion.' (Cal. Const., art. I, § 4.) [¶] But California's constitutional provisions are more comprehensive than those of the federal Constitution (*Fox* v. *City of Los Angeles* (1978) 22 Cal.3d 792, 796 [150 Cal.Rptr. 867, 587 P.2d 663]), and particularly so in the area of involvement of religion in schools. Thus, article XVI, section 5, in providing that 'Neither the Legislature, nor any county, city and county, township, school district, or other municipal corporation, shall ever make an appropriation, or pay from any public fund whatever, or grant anything to or in aid of any religious sect, church, creed, or sectarian purpose to help or to support or to sustain any school, college, university . . . ,' 'forbids more than the appropriation or payment of public funds to support sectarian institutions. *It bans any official involvement, whatever its form, which has the direct, immediate, and substantial effect of promoting religious purposes.*' (*California Educational Facilities Authority* v. *Priest* (1974) 12 Cal.3d 593, 605, fn. 12 [116 Cal.Rptr. 361, 526 P.2d 513].)" (*Bennett* v. *Livermore Unified School Dist.* (1987) 193 Cal.App.3d 1012, 1016-1017 [238 Cal.Rptr. 819], italics added.)

California, pursuant to Education Code section 48907 insures students free speech rights provided there is no disruption of the educational process. But the statute also allows for school districts to promulgate their own

lawful regulations and provides the students' rights may be restricted if the expression is in violation of those regulations.[3]

■ The district, pursuant to Education Code section 48907, enacted board policy 5133.1 prohibiting off-campus groups from functioning or advertising on campus.[4] But Perumal and Read maintain because they are petitioning as individuals and not as members of groups, board policy 5133.1 is inapplicable. We disagree.

New Life falls within the plain and ordinary meaning of an "off-campus or private club." ■ A group is a club when it advertises itself as an identifiable entity, promotes a common purpose, and solicits new members.

---

[3] The California Legislature defined the free speech rights of public school students in section 48907: "Students of the public schools shall have the right to exercise freedom of speech and of the press including, but not limited to, the use of bulletin boards, the distribution of printed materials . . . and the right of expression in official publications, whether or not such publications or other means of expression are supported financially by the school or by use of school facilities, . . ." The section permits expression to be restricted which may result in "the violation of lawful school regulations, or the substantial disruption of the orderly operation of the school."

Section 48907 requires each school district to adopt reasonable written provisions "for the time, place, and manner of conducting such activities . . . ." Furthermore, it prohibits "prior restraint of material prepared for official school publications [including yearbooks] except insofar as it violates this section." The school district has the burden of showing justification for any limitation of student speech without undue delay.

[4] Board policy 5133.1 states in pertinent part: "*Clubs: School Sponsored.* [¶] Clubs recognized by the Board of Education are those which are sponsored by the individual schools of the district. Clubs shall be responsible to the school through which they are organized. [¶] [¶] [¶] School-sponsored clubs may be permitted to use official name of the school, to use building and other facilities, to have publicity in daily bulletins, bulletin boards and school publications, to wear identifying emblem but not special clothing, to sell on school premises tickets or bids to special activities sponsored by the club. [¶] No off-campus or private clubs are permitted to function in the school. They are also restricted from advertising in any form. [¶] The only clubs and organizations which may use school facilities during the school day are those which are school sponsored. The school day includes nonclassroom time." (Pp. 1-2.)

Administrative Regulation 5133.1 states in pertinent part: "1. *Responsibilities of the Principal* (continued) [¶] (d) The principal shall ascertain that all clubs sponsored by the school are not unlawfully selective nor discriminatory in membership selection nor in the conduct of their activities. Any incidence of unlawful selection or discriminatory conduct is to be dealt with by causing the unlawful practice to cease or by disbanding the club. [¶] (e) The principal shall be responsible for making sure no off-campus, private, or non-sponsored clubs or organizations function on the campus during the school day, including break times, lunch, or other non-classroom time. These clubs or organizations may apply through the appropriate Use of Facility channels to use school facilities outside of the school day." (P. 2.)

"a. *Clubs: School Sponsored* (continued) [¶] 3. *Freedom of Expression* [¶] Nothing in Board Policy 5133.1 nor Administrative Regulation 5133.1 shall be construed to be in opposition to students' rights of freedom of expression as specified in Education Code Section 48916 or Board Policy 5145.3 and 6144.1." (P. 3.)

Webster's Third New International Dictionary (1971) at page 430, column 1, b(1), defines "club" as "an association of persons for social and recreational purposes or for the promotion of some common object (as literature, science, political activity) usually jointly supported and meeting periodically . . ."

■■■ New Life has always been identified by its specific name. In their correspondence with the district, Perumal and Read referred to their groups as New Life. The advertisements sought to be distributed and published promote "New Life at ETHS" and "Mission Viejo New Life."

Both New Life groups maintained leadership structures to effectively pursue the club's purpose and recruit new members. In their communications with the district, including their requests to distribute literature, Perumal and Read referred to themselves as "president" of their respective groups. As Perumal's and Read's advertisements indicated, the New Life groups met on specific days, at a specific time, and in a specific location. The meetings were not merely spontaneous lunch discussions.

Moreover, their proposed advertisements put to rest any lingering doubts. They provide information on the group known as "New Life" and a meeting schedule. They also state the purpose is "meeting other Christians," "studying the Bible," and "prayer." The New Life groups are private clubs within the commonly understood meaning of "off-campus or private club."

Board policy 5133.5 prohibits off-campus clubs from functioning or advertising on campus. The students argue board policy 5133.1 is vague and overbroad because it does not explain what an "off-campus or private club" is and therefore they do not know how to conform with the regulation. They also suggest they must, by definition, *not* be off-campus or private clubs because the district did not object to the New Life meetings until there was an attempt to advertise. Therefore, the New Life groups could not be off-campus or private clubs because advertising should not transform an otherwise permissible informal discussion group into an impermissible club.

But the students miss the point. New Life is a group, and not just because it advertises. And the fact the board has allowed the students to informally meet is of no moment. The district in enacting board policy 5133.5 changed from a limited open forum to a closed forum. But as the district acknowledges, interpersonal communication or informal discussions between students during the school day cannot be prohibited. And students may still organize, outside of the school setting, to conduct more formal discussions.

Seemingly, the yearbook presents a different issue; the school opened its advertising section to anyone who wished to purchase space. The students rely on the Federal Equal Access Act of 1984. (20 U.S.C. § 4071.)[5] The act applies to any public secondary school which receives federal financial assistance. However, the act is irrelevant in the present case. It applies only to schools which have adopted a *limited open* forum policy. This school district as discussed, *ante,* has not. The district has chosen a closed forum and only school-sponsored clubs may function or *advertise.*[6]

### III

A state or federal constitutional analysis brings no different result. Cases involving students' religious rights must be reviewed in the context of their First Amendment rights *and* the district's mandate to avoid violating the establishment clause of the First Amendment. ■ "The free exercise clause of the federal Constitution embodies two rights: Freedom to believe and freedom to act. 'The first is absolute but, in the nature of things, the second cannot be.' [Citation.] Under the free exercise clause, freedom of

[5] 20 United States Code section 4071 provides: "(a) Restriction of limited open forum on basis of religious, political, philosophical, or other speech content prohibited [¶] It shall be unlawful for any public secondary school which receives Federal financial assistance and which has a limited open forum to deny equal access or a fair opportunity to, or discriminate against, any students who wish to conduct a meeting within that limited open forum on the basis of the religious, political, philosophical, or other content of the speech at such meetings. [¶] (b) 'Limited open forum' defined [¶] A public secondary school has a limited open forum whenever such school grants an offering to or opportunity for one or more noncurriculum related student groups to meet on school premises during noninstructional time. [¶] (c) Fair opportunity criteria [¶] Schools shall be deemed to offer a fair opportunity to students who wish to conduct a meeting within its limited open forum if such school uniformly provides that—

"(1) the meeting is voluntary and student-initiated;

"(2) there is no sponsorship of the meeting by the school, the government, or its agents or employees;

"(3) employees or agents of the school or government are present at religious meetings only in a nonparticipatory capacity;

"(4) the meeting does not materially and substantially interfere with the orderly conduct of educational activities within the school; and

"(5) nonschool persons may not direct, conduct, control, or regularly attend activities of student groups."

We note at least one federal court has found application of the Federal Equal Access "Act would require an unconstitutional result." (*Clark* v. *Dallas Independent School Dist.* (N.D. Tex 1987) 671 F.Supp. 1119, 1124. In *Clark,* public high school students wished to conduct prayer meetings on a limited open forum campus. The court concluded the result demanded by the Act was constitutionally impermissible. "[E]stablishment clause interests of the [school] district prevail over the free exercise interests of [the students]." (*Ibid.*)

[6] Moreover, the act would apply only to students who "wish to conduct a meeting within that limited open forum." The students, in placing the advertisement in the yearbook, wished to promote their group. Stated simply, the yearbook announcement was not a "meeting" and the students cannot rely upon the act.

conscience and freedom to adhere to such religious organizations or beliefs as the individual may choose is secured against governmental interference. [Citation.] This is not to say, however, that religion may be exercised wherever and whenever the adherent chooses. [Citations.] The inevitable consequence of the establishment clause when applied to religious ritual on school property is to restrict that activity to preserve the wall between church and state. ' "Our constitutional policy . . . does not deny the value or the necessity for religious training, teaching or observance. Rather it secures their free exercise. But to that end it does deny that the state can undertake or sustain them in any form or degree. For this reason the sphere of religious activity, as distinguished from the secular intellectual liberties, has been given the two fold protection and, as the state cannot forbid, neither can it perform or aid in performing the religious function. The dual prohibition makes that function altogether private." ' [Citations.]" (*Johnson v. Huntington Beach Union High Sch. Dist.* (1977) 68 Cal.App.3d 1, 16-17 [137 Cal.Rptr. 43], fn. omitted.)

In *Johnson,* "(high school students) sought judicial relief from a refusal of the . . . [high school] (district) to permit a voluntary student Bible study club to meet and conduct its activities on the school campus during the school day." (*Id.* at p. 6.) The court recognized "The precise question we must decide is whether school officials of a tax-supported high school of the district may permit plaintiffs' Bible study club to meet and [to] *conduct its activities* on the school campus during the school day . . . ." (*Id.,* at p. 11, italics added.)

In determining whether the school district was constitutionally required to bow to the student religious group's demands, the *Johnson* court relied on the tripartite test enunciated by the U.S. Supreme Court in *Lemon* v. *Kurtzman* (1971) 403 U.S. 602, 612-613 [29 L.Ed.2d 745, 755-756, 91 S.Ct. 2105]. ■ "To pass constitutional muster the state activity must satisfy three conditions: (1) It must have a secular legislative purpose; (2) its primary effect must neither advance nor inhibit religion; and (3) it must not foster excessive governmental entanglement with religion. . . . Failure to meet any one of the three conditions is fatal to the constitutionality of state action. [Citations.]" (*Johnson* v. *Huntington Beach Union High Sch. Dist., supra,* 68 Cal.App.3d 1, 11.)

The court addressed all three conditions, but adjudged the primary effect of allowing the Bible study club to meet and to conduct its activities would be to advance religion because "state financial support would flow directly to the club." (*Id.,* at p. 12.) It did "not rest [its] decision . . . on financial aid alone . . . [but acknowledged] . . . [t]his aspect of the effect test reaches

the essence of the establishment clause proscription. . . . [I]mpermissible governmental support is present when the weight of secular authority is behind the dissemination of religious tenets." (*Id.*, at pp. 12-13, fn. omitted.)

Perumal and Read argue, and we acknowledge, many factual differences between the *Johnson* scenario and ours. The students in *Johnson* attempted to meet in a classroom and sought the services of a paid faculty sponsor. But we find the similarity of the student requests more convincing than the differences.

"Under the district's rules and regulations, the club will become an entity 'sponsored by the school' and as such will be entitled to use the school name in connection with its activities, to free use of school premises and property, to access to the school newspaper and school posting facilities to advertise its activities, and to solicit contributions on campus during the school day. *Thus, the consequence of permitting the club to operate on campus as a recognized student organization is to place school support and sponsorship behind the religious objectives of the club.* The Bible study club would implicitly become an integral part of the school's extracurricular program conducted during the school day when students are compelled by law to attend the school." (*Id.,* at p. 13, fn. omitted, italics added.)

"The school permission sought by plaintiffs would meld the secular with the sectarian and would empower the Bible study club members to use the prestige and authority of the school in proselytizing their beliefs among students whose presence on the campus is compelled by law and who may be vulnerable to the pressure of an officially recognized student religious organization. This, the First Amendment will not permit." (*Id.,* at p. 15.)[7]

Nor does it matter that the religious activity was student initiated. In *Collins* v. *Chandler Unified School Dist.* (9th Cir. 1981) 644 F.2d 759, public high school students sought permission to open voluntary assemblies with prayer. The court found permission to do so would violate the Establishment Clause. The court concluded there is "no meaningful distinction between school authorities actually organizing the religious activity and officials merely 'permitting' students to direct the exercises." (*Id.,* at p. 761.) The board cannot adopt a hands-off policy. It is mandated "to deny the use

---

[7]The court, relying on section 4 of article I and section 5 of article XVI of the California Constitution also "conclude[d] that the California Constitution will not suffer school officials to permit plaintiffs' Bible study club to meet and conduct its activities on school campus during the school day." (*Johnson* v. *Huntington Beach Union High Sch. Dist., supra,* 68 Cal.App.3d at p. 16.)

of school facilities to the students who shall voluntarily and upon their own initiative, perform such religious exercises . . . ." (*Id.,* at p. 762.)[8]

In *Brandon v. Board of Ed. of Guilderland Cent. Sch.* (2d Cir. 1980) 635 F.2d 971, several high school students sought permission from their school principal to conduct communal prayer meetings on campus immediately before the school day commenced. "The group noted that it was not seeking supervision or faculty involvement, and stated that its activities were voluntary and would not conflict with other school functions." (*Id.,* at p. 973.)

The court found the students' free exercise of their rights were not significantly encumbered by the "District's refusal to permit communal prayer meetings to occur on school premises." (*Id.,* at p. 977.) The court noted even if those rights were limited, "an authorization of student-initiated voluntary prayer would have violated the Establishment Clause by creating an unconstitutional link between church and state." (*Id.,* at p. 978.)

The court was unimpressed with the students' argument they merely were "seek[ing] to exercise their rights to free speech in a public forum, unencumbered by governmental regulation of the context of their 'speech.'" (*Id.,* at p. 980.) The court recognized "a high school is not a *'public forum'* where religious views can be freely aired. The expression of religious points of view, and even the performance of religious rituals, is permissible in parks and streets when subject to reasonable time, place, and manner regulations. [Citations.] The facilities of a university have also been identified as a 'public forum,' where religious speech and association cannot be prohibited. [Citations.] A high school classroom, however, is different [citation]. While students have First Amendment rights to political speech in public schools [citation], sensitive Establishment Clause considerations *limit their right to air religious doctrines.* . . . [S]tudents' free speech and associational rights, cognizable in a 'public forum,' are severely circumscribed by the Establishment Clause in the public school setting. Because of the symbolic effect that prayer in the schools would produce, we find that Establishment Clause considerations must prevail in this context." (*Id.,* at p. 980, italics added.)

We conclude, therefore, that board policy 5133.5 is a constitutionally permissible school board regulation. It allows only school-sponsored activi-

[8] The court relied on section 4 of article I and section 5 of article XVI of the California Constitution, holding "[T]he state action . . . is proscribed . . . . [¶] [The state constitution] 'bans any *official* involvement, whatever its form, which has the direct, immediate, and substantial effect of promoting religious purposes.' [Citation.]" (*Johnson v. Huntington Beach Union High Sch. Dist., supra,* 68 Cal.App.3d at pp. 15-16.)

ties on its campus. It meets all prongs of the *Lemon* test and therefore does not contravene the establishment clause. Its enactment is secular, promoting the general well-being of the campus; because religious groups are not singled out for better or worse treatment, its principal or primary effect neither advances nor inhibits religion. No entanglement with religion exists.

So long as the district maintains a closed-forum policy, it cannot constitutionally recognize New Life groups as school-sponsored clubs. The groups without such recognition may not hand out the flyers on campus nor may they advertise in the yearbook.

Judgment affirmed.

Wallin, Acting P. J., concurred.

**CROSBY, J.**—I emphatically dissent from my colleagues' decision to uphold state suppression of student speech in this case. Ironically, in another opinion filed today we recognize the broad right of free expression accorded to high school editors of official campus publications under the law of California. (*Leeb* v. *DeLong* (1988) *ante*, p. 47 [243 Cal.Rptr. 484].) The specific expression at stake there consisted of a trivial little article in an April Fool's Day spoof edition of a high school newspaper accompanied by a picture of five coeds supposedly applying to pose nude in Playboy magazine. The issue was suppressed by the school district as potentially defamatory. *Leeb* holds a significant threat of a successful defamation action is one of the very few instances in which a school administration may censor its own student publications; it also notes that *no* such right exists with respect to the private publications of students merely because they are distributed on campus. (*Id.,* at pp. 57-58.)

Here, by contrast, we deal with serious student expression having no discernible prospect of reflecting badly on the school, the district, or any particular student—much less of threatening a potential action for damages against the district—yet the majority of this panel unfortunately and unnecessarily restricts the rights described in *Leeb* in both school-sponsored and privately produced student publications, defending its action in the name of the First Amendment of the United States Constitution.[1] Petitioners may have "expected a civics lesson, but not the one the Court teaches them

---

[1] The First Amendment provides, "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances."

today." (*Hazelwood School District* v. *Kuhlmeier* (1988) 484 U.S. 260, __ [98 L.Ed.2d 592, 618, 108 S.Ct. 562] (dis. opn. of Brennan, J.).)

"In God We Trust" graces every United States coin a child hands to the ice cream man, and public school students who choose to participate in chanting the flag salute announce that we are "one nation, under God . . . ." At the commencement of every session of the United States Supreme Court, the bailiff invokes the protection of the Almighty; and every justice of that court and every president in our country's history has been sworn into office with a hand on the Bible. And so on, and so on, and so on. Our Constitution does not seek to secularize society; it fosters tolerance.

The present majority, however, manages to treat the free expression of high school students during recess and a section of the yearbook devoted to paid advertisements as an anathema equivalent to the distribution of drugs or obscenity on campus or the broadcast of ship departures in wartime. This jarring invasion of fundamental liberties is required, we are told, simply because the students' expression purportedly was of a religious nature. But one person's "religious" expression is another's trash. It is not up to school districts, courts, or anyone else to make such classifications, legally or morally, with respect to the unsubsidized musings and writings of private persons. These petitioners should have been left to distribute their harmless scraps of paper and run the innocuous little yearbook ad.

I would issue a writ of mandate to require the school district to treat so-called religious advertisements in the high school yearbook no differently from commercial speech in that forum and to cease interference with the distribution of New Life flyers, subject only to reasonable time, place, and manner restrictions.[2] In my opinion, both the federal and state[3] Constitu-

---

[2] Although the yearbook has long since been published and petitioners have undoubtedly graduated, I agree the appeal should not be dismissed for mootness, as the district argues. Where important constitutional rights are implicated and "the constitutional issue raised is of continuing public interest and likely to recur in circumstances where, as here, there is insufficient time to afford full appellate review . . . it is appropriate to resolve the matter . . . ." (*John A.* v. *San Bernardino Unified School Dist.* (1982) 33 Cal.3d 301, 307 [187 Cal.Rptr. 472, 654 P.2d 242]; *Gordon J.* v. *Santa Ana Unified School Dist.* (1984) 162 Cal.App.3d 530, 533 [208 Cal.Rptr. 657].)" (*Leeb* v. *DeLong, supra, ante,* at p. 51.)

[3] The right to free expression contained in the California Constitution is more liberally construed than the First Amendment. (*Wilson* v. *Superior Court* (1975) 13 Cal.3d 652, 658 [119 Cal.Rptr. 468, 532 P.2d 116]; *Leeb* v. *DeLong, supra, ante,* at p. 52, fn. 1.) Article I, section 2, subdivision (a) states, "Every person may freely speak, write and publish his or her sentiments on all subjects, being responsible for the abuse of this right. A law may not restrain or abridge liberty of speech or press." Article I, section 4, provides, "Free exercise and enjoyment of religion without discrimination or preference are guaranteed. This liberty of conscience does not excuse acts that are licentious or inconsistent with the peace or safety of the State. The Legislature shall make no law respecting an establishment of religion."

tions, Education Code section 48907,[4] and the spirit, if not the letter, of the Equal Access Act (20 U.S.C. § 4071 et seq.)[5] require the opposite conclusion.

[4] Education Code section 48907 states, "Students of the public schools shall have the right to exercise freedom of speech and of the press including, but not limited to, the use of bulletin boards, the distribution of printed materials or petitions, the wearing of buttons, badges, and other insignia, and the right of expression in official publications, whether or not such publications or other means of expression are supported financially by the school or by use of school facilities, except that expression shall be prohibited which is obscene, libelous, or slanderous. Also prohibited shall be material which so incites students as to create a clear and present danger of the commission of unlawful acts on school premises or the violation of lawful school regulations, or the substantial disruption of the orderly operation of the school. [¶] Each governing board of a school district and each county board of education shall adopt rules and regulations in the form of a written publications code, which shall include reasonable provisions for the time, place, and manner of conducting such activities within its respective jurisdiction. [¶] Student editors of official school publications shall be responsible for assigning and editing the news, editorial, and feature content of their publications subject to the limitations of this section. However, it shall be the responsibility of a journalism adviser or advisers of student publications within each school to supervise the production of the student staff, to maintain professional standards of English and journalism, and to maintain the provisions of this section. [¶] *There shall be no prior restraint of material prepared for official school publications except insofar as it violates this section.* School officials shall have the burden of showing justification without undue delay prior to any limitation of student expression under this section. [¶] 'Official school publications' refers to material produced by students in the journalism, newspaper, yearbook, or writing classes and distributed to the student body either free or for a fee. [¶] Nothing in this section shall prohibit or prevent any governing board of a school district from adopting otherwise valid rules and regulations relating to oral communication by students upon the premises of each school." (Italics added.)

In compliance with Education Code section 48907, the district has passed an implementing regulation, Board Policy 5145.3. (See *Leeb* v. *DeLong, supra, ante,* at p. 62.) It contains no provision specifically concerning religious speech.

[5] 20 U.S.C section 4071 provides, "(a) It shall be unlawful for any public secondary school which receives Federal financial assistance and which has a limited open forum to deny equal access or a fair opportunity to, or discriminate against, any students who wish to conduct a meeting within that limited open forum on the basis of the religious, political, philosophical, or other content of the speech at such meetings. [¶] (b) A public secondary school has a limited open forum whenever such school grants an offering to or opportunity for one or more noncurriculum related student groups to meet on school premises during noninstructional time. [¶] (c) Schools shall be deemed to offer a fair opportunity to students who wish to conduct a meeting within its limited open forum if such school uniformly provides that—

"(1) the meeting is voluntary and student-initiated;

"(2) there is no sponsorship of the meeting by the school, the government, or its agents or employees;

"(3) employees or agents of the school or government are present at religious meetings only in a nonparticipatory capacity;

"(4) the meeting does not materially and substantially interfere with the orderly conduct of educational activities within the school; and

"(5) nonschool persons may not direct, conduct, control, or regularly attend activities of student groups."

I

In this section of the discussion I examine the questions presented in light of the general constitutional heritage of this state's legislative scheme and will conclude that the district's responses find no blessing in that quarter.[6] In the section following, I will consider—and reject—the contention that the district's actions were nonetheless compelled by the establishment of religion clauses of the federal and state Constitutions.

The most obvious difficulty is the content-based refusal to permit publication of the flyers and yearbook advertisement. Prior restraints are highly disfavored and may rarely be invoked in any circumstance. (Ed. Code, § 48907; *Near* v. *Minnesota* (1931) 283 U.S. 697 [75 L.Ed. 1357, 51 S.Ct. 625]; *Dailey* v. *Superior Court* (1896) 112 Cal. 94 [44 P. 458]; but see *Hazelwood School District* v. *Kuhlmeier, supra,* 484 U.S. 260 [school administration may censor official high school newspaper without offending First Amendment].) As we noted in *Leeb,* "in the case of underground or unofficial [high school] publications . . . [t]he school is merely a distribution point and has neither a legal responsibility for content nor a corresponding right to censor . . . per Education Code section 48907. The power to regulate the time, place, and manner of expression cannot be converted into a right to control content." (*Leeb* v. *DeLong, supra, ante,* at p. 59, fn. 7.) The district's argument to the contrary is a circular transformation of procedure into substance: The district's undoubted, and uncontested, right to manage its campuses does not confer an editorial license as well. (Ed. Code, § 48907; *Hazelwood School District* v. *Kuhlmeier, supra,* 484 U.S. at p. __ [98 L.Ed.2d at p. 605]; *Tinker* v. *Des Moines School Dist.* (1968) 393 U.S 503 [21 L.Ed.2d 731, 89 S.Ct. 733].)

---

[6]Although petitioners' brief on appeal appears to attempt to revive the effort to achieve equal on-campus status (see *Bender* v. *Williamsport Area School Dist.* (1986) 475 U.S. 534, 553-554 [89 L.Ed.2d 501, 519, 106 S.Ct. 1326] (dis. opn. of Burger, C. J.); *Widmar* v. *Vincent* (1981) 454 U.S. 263 [70 L.Ed.2d 440, 102 S.Ct. 269]), the petition for writ of mandate was narrowly drawn. It sought only an order permitting distribution of the flyers and publication of one yearbook advertisement. My analysis is confined to those issues which, as the introductory paragraph suggests, essentially (although not entirely) cast this case in an establishment clause/free press context rather than as a clash of the establishment and free exercise clauses of the First Amendment and their California counterparts.

The latter case is surely on the horizon, however. (See, e.g., Ares, *Religious Meetings in the Public High School: Freedom of Speech or Establishment of Religion?* (1987) 20 U.C. Davis L.Rev. 313 and cases cited at p. 314, fn. 3.) On-campus status for religious clubs was the issue the Supreme Court failed to reach on procedural grounds in *Bender*. Professor Ares sees an emerging rationale in that court favoring the free exercise clause over the establishment clause in the public schools but argues strongly against the notion of officially sponsored school meetings of religious groups. That issue was decided some time ago by Division Two in a manner consistent with Professor Ares's views. (*Johnson* v. *Huntington Beach Union High Sch. Dist.* (1977) 68 Cal.App.3d 1 [137 Cal.Rptr. 43], cert. den. 434 U.S. 877 [54 L.Ed.2d 156, 98 S.Ct. 228].)

Students have a broad right to publish their own *privately* produced writings on campus, and under Education Code section 48907 student distribution of such material may not be subjected to prior restraints. (*Ibid.*) The Legislature knows how to implement a prior restraint; and where it has specifically chosen not to do so, no such right may be implied. (*Bright* v. *Los Angeles Unified Sch. Dist.* (1976) 18 Cal.3d 450, 463-464 [134 Cal.Rptr. 639, 556 P.2d 1090].) Both school principals were certainly aware the flyers were produced, and to be distributed, by students. Thus, notwithstanding the board policy, the district had no power to bar dissemination of the flyers under the law of this state. Whether their publication could have led to some sort of disciplinary action is another question (but the correct answer is, "No").

It is to be remembered that New Life meetings were tolerated as informal campus get-togethers of a type that would be difficult to prevent under the free association and free exercise clauses of the First Amendment. (See, e.g., *Bender* v. *Williamsport Area School Dist., supra,* 475 U.S. at p. 553-554 [89 L.Ed.2d at p. 519] (dis. opn. of Burger, C. J.); *Widmar* v. *Vincent, supra,* 454 U.S. 263, 276 [70 L.Ed.2d 440, 451]; *Zorach* v. *Clauson* (1952) 343 U.S. 306 [96 L.Ed. 954, 72 S.Ct. 679].) They were not treated as improper reunions of off-campus clubs. Moreover, review of the flyers petitioners sought to distribute does not disclose a connection with any off-campus organization at all. Stripped of the hyperbole, they are simply announcements of voluntary lunchtime sessions to study the Bible, meet "other Christians," and engage in prayer. To the extent that the lead opinion attempts to defend its conclusion on board policy 5133.1, it is for this reason bankrupt. The questions presented in this case turn on no puny policy of a local school district; they are controlled by a reconciliation of the various clauses of the First Amendment and their state counterparts and nothing less.

Yearbook advertisements do appear in official publications and, consequently, are subject to the very narrow censorship right we recognized in *Leeb.* But nothing in Education Code section 48907 authorizes the prior restraint of any expression, religious or otherwise, unless it is obscene or defamatory or contains "material which so incites students as to create a clear and present danger of the commission of unlawful acts on school premises or the violation of lawful school regulations, or the substantial disruption of the orderly operation of the school." This advertisement met none of those criteria.

The district argues the advertisement would violate the establishment of religion clauses of the federal and state constitutions. (U.S. Const., 1st

Amend.; Cal. Const., art. I, § 4; see *ante,* fns. 2 and 3.) But even if this contention were true (and I will conclude it is not), use of a prior restraint to ban mere religious speech is not constitutionally required; and it is specifically prohibited by Education Code section 48907.

Section 48907 only allows the suppression of material in official student publications which might incite *others* to a violation of a law or regulation. Its literal language does not include material which might *itself* offend some law or regulation, unless it is obscene or defamatory. High school students cannot transgress the establishment clause; only governments can. Thus, insofar as a potential violation of the establishment clause formed the basis for the censorship of the advertisement under the very limited power to impose prior restraints granted in section 48907, the district erred.

In denying publication of the advertisement, the Mission Viejo principal apparently believed it might create the "clear and present danger" of an unauthorized on-campus meeting of an off-campus club in violation of board policy 5133.1.[7] The contention is not tenable for several reasons. The school administration had never taken the position that New Life meetings violated any policy of the district.[8] Moreover, "[m]ere speculation on the part of the state that individuals might at some time engage in illegal activity is insufficient to justify regulation. [Citation.]" (*San Diego Committee* v. *Governing Bd.* (9th Cir. 1986) 790 F.2d 1471, 1479 [high school newspaper which accepted military recruitment advertisements created a limited public forum and could not refuse to publish a paid message submitted by an antidraft group].) Also, the likelihood that an advertisement published in a yearbook at the end of the school year might have a significant impact on New Life attendance in the present or ensuing term is remote at best. Finally, New Life meetings were part of school life; there is no compelling reason why they should not have been allowed a small *paid* remembrance in the chronicle of the year's events.

In short, the yearbook ad did not fall within any of the prohibited statutory categories. Its acceptance by the student editor was the final word on

---

[7] The same is true of the flyers. One of the two announced reasons for their prohibition was the implied determination that they might trigger an impermissible assemblage of an off-campus club: The identically phrased rejection letters to petitioners stated, "In that Board Policy 5133.1 is a 'lawful school regulation,' a student's exercise of free expression under Education Code Section 48907 would be inapplicable." The second reason was the district's claim that permitting their distribution would offend the establishment clause.

[8] Education Code section 48907 can be read, however, to imply a right to meet, discuss religion, and even to pray since it prohibits interference with student speech whether or not the "means of expression [is] supported . . . by use of school facilities." The constitutionality of such an interpretation is a question for another day.

the subject under California law. (Ed. Code, § 48907; *Leeb* v. *Delong, supra, ante,* at p. 54; cf. *Hazelwood School District* v. *Kuhlmeier, supra,* 484 U.S. 260.) Consequently, the board's policy, as it was applied here, abridged Education Code section 48907's guarantee of freedom of student expression.

The first line of board policy 5133.1 prohibits the functioning of off-campus or private clubs in the school. The policy goes on to state, "They [off-campus and private clubs] are also restricted from advertising in any form."[9] I have no difficulty with a prohibition on outside organizations advertising on campus. A public high school is not constitutionally compelled to operate as the equivalent of a town square, so that nonstudents must be allowed to communicate with the students on campus. (Cf. *Robins* v. *Pruneyard Shopping Center* (1979) 23 Cal.3d 899 [153 Cal.Rptr. 854, 592 P.2d 341], affd. *sub nom. Pruneyard Shopping Center* v. *Robins* (1980) 447 U.S. 74 [64 L.Ed.2d 741, 100 S.Ct. 2035].)

Petitioners make no contrary argument. But they do insist without serious contradiction that they have no club membership at all, off-campus or otherwise, and are merely unorganized groups of students who meet during scheduled recesses. They also aptly note the district classified them as a club merely because board policy defines clubs as groups who advertise.[10]

Petitioners' criticism of this portion of the policy is well taken: Students who desire to advertise free-time meetings may not be converted ipso facto into impermissible "clubs" based on that fact alone. As applied to *students* of the school, such an interpretation of board policy 5133.1 would hopelessly conflict with Education Code section 48907: "Students of the public schools shall have the right to exercise freedom of speech and of the press including, but not limited to, the use of bulletin boards, the distribution of printed materials [ ], . . . and the right of expression in official publications, whether or not such publications or other means of expression are supported financially by the school or by use of school facilities . . . ." Using a "Through the Looking Glass" technique of defining an exercise of the rights conferred in Education Code section 48907 as an act of an off-campus or private club, the district has, in effect, repealed a legislative enactment. This, of course, it may not do.

---

[9] This can only be understood as referring to on-campus advertising. Read to ban off-campus advertising by off-campus clubs, the policy would clearly be beyond the lawful mission of a public school and repugnant to the First Amendment and article I, section 2, subdivision (a) of the California Constitution.

[10] The district played both sides of this particular street, and petitioners now attempt to do the same. As noted above (see fn. 6), Perumal and Read *previously* desired official club status; but the district consistently refused to grant it.

Translated, school policy permits students to discuss whatever they wish during the lunch period so long as they do not announce the meetings in advance. Not surprisingly, apart from establishment clause theory, the district fails to cite any authority in support of its right to formulate such a rule; and I have discovered none.

## II

Was the district compelled by the establishment clauses of the federal and state constitutions to take the various actions contested here despite the free press rights of the students and the literal language of Education Code section 48907? I think not.

The plight of the district and its elected trustees is understandable. Beset by community pressure from advocates on both sides of the question, they have quite properly sought to steer a course of strict neutrality toward on-campus religious expression.[11] If any guiding principle has received general support in our highest court, it is this: "[T]o withstand the strictures of the Establishment Clause there must be a secular . . . purpose and a primary effect that neither advances *nor inhibits religion.*" (*Abington School District v. Schempp* (1963) 374 U.S. 203, 222 [10 L.Ed.2d 844, 858, 83 S.Ct. 1560], italics added.) And the trustees were required to develop a policy in the legal context of what Justice Scalia and Chief Justice Rehnquist rather aptly labeled the Supreme Court's "embarrassing Establishment Clause jurisprudence. . . ." (*Edwards* v. *Aguillard* (1987) 482 U.S. 578, 639 [96 L.Ed.2d 510, 555, 107 S.Ct. 2573] (dis. opn. of Scalia, J.).)[12] Cases similar to the present one have repeatedly confounded and sundered the membership of that court, as an examination of the various opinions and authorities cited in *Edwards* will attest. (See also Choper, *The Religion Clauses of the First Amendment, supra,* 41 U.Pitt.L.Rev. 673.)

---

[11] I say "properly" because "strict neutrality" is one of the phrases most often used to describe the correct posture of a school district toward religion in public schools. The idea is not without cogent critics, however: "Paradoxically, the neutrality principle not only requires hostility to religion at odds with the values of the Free Exercise Clause, but also permits aid to religion in conflict with values of the Establishment Clause." (Choper, *The Religion Clauses of the First Amendment: Reconciling the Conflict* (1980) 41 U.Pitt.L.Rev. 673, 689.)

[12] Dean Choper describes the Supreme Court's establishment clause cases as a "conceptual disaster area." (Choper, *The Establishment Clause and Aid to Parochial Schools—An Update* (1987) 75 Cal.L.Rev. 5, 6.) In another article he pointedly comments on the Supreme Court's own indictment of its rulings on this subject: "Indeed, in an unusually candid recent dictum, the Court forthrightly conceded that its approach in this area 'sacrifices clarity and predictability for flexibility' [citing *Committee for Public Education* v. *Regan* (1980) 444 U.S. 646, 662 (63 L.Ed.2d 94, 107, 100 S.Ct. 840)]—a euphemism, I suggest, for expressly admitting the absence of any principled rationale for its product." (Choper, *The Religion Clauses of the First Amendment, supra,* 41 U.Pitt.L.Rev. at p. 681.)

Over the years courts have rejected numerous attempts by public school students to conduct formal Bible study and religious meetings on campus, usually determining the proposed student activity would impermissibly engage the state with religion. But it is also beyond cavil that "freedoms of speech and of press, of assembly, and worship may . . . be infringed . . . . only to prevent grave and immediate danger to interests which the state may lawfully protect." *(Board of Education* v. *Barnette* (1943) 319 U.S. 624, 639 [87 L.Ed. 1628, 1638, 63 S.Ct. 1178, 147 A.L.R. 674]; see also *San Diego Committee* v. *Governing Bd., supra,* 790 F.2d at p. 1478.) It is difficult to visualize purely student produced handbills or yearbook advertisements of a religious bent in terms of "grave and immediate danger." That sort of hysteria is generally reserved for the treatment of religious questions behind the Iron Curtain. In this country the state may not "lawfully protect" students from the free expression of their classmates unless, at a minimum, it presents a clear and present danger that the educational mission of the school might be adversely affected. *(Tinker* v. *Des Moines School Dist., supra,* 393 U.S. 503.) No such extreme situation exists here, of course.

The key to the establishment clause decisions as they relate to public schools and student religious activity, if there is one, appears to be this: Who has initiated and sponsored that activity? If the state is the moving force, the establishment clause is almost invariably held to be offended. If the impetus is, as here, from the students themselves, or their parents perhaps, and the taxpayers' facilities are not unduly or unusually utilized, other First Amendment values may win out.[13] (See, e.g., 20 U.S.C. § 4071.)

Indeed, one commentator has noted, "The claim for some religious activity in the public schools is truly forceful only in the free speech claims of those seeking to engage in their own religious practices without governmental leadership. Even then, however, the claim is convincing only where the state allows, or is compelled to allow, comparable non-religious speech to be exercised. In such cases, denial of the right of a religious group to speak

---

[13] Examples of impermissible state action designed to promote religion are the following: *Edwards* v. *Aguillard, supra,* 482 U.S. 578 [96 L.Ed.2d 510] [statute required teaching of "creation science" if school elected to teach theory of evolution]; *Grand Rapids School District* v. *Ball* (1985) 473 U.S. 373 [use of public school teachers to instruct parochial school pupils in nonpublic school classrooms "leased" to the school district]; *Wallace* v. *Jaffree* (1985) 472 U.S. 38 [use of religious school teachers in public schools]; *Stone* v. *Graham* (1980) 449 U.S. 39 [66 L.Ed.2d 199, 101 S.Ct. 192] [required posting of Ten Commandments in public classroom]; *Epperson* v. *Arkansas* (1968) 393 U.S. 97 [21 L.Ed.2d 228, 89 S.Ct. 266] [teaching of evolution forbidden by statute]; *Abington School Dist.* v. *Schempp, supra,* 374 U.S. 203 [requirement that school day begin with Bible readings]; *Engel* v. *Vitale* (1962) 370 U.S. 421 [8 L.Ed.2d 601, 82 S.Ct. 1261, 86 A.L.R.2d 1285] [recitation of prayer in classroom]; *McCollum* v. *Board of Education* (1948) 333 U.S. 203 [92 L.Ed. 649, 68 S.Ct. 461, 2 A.L.R.2d 1338] [use of religious school teachers in public school curriculum 30 minutes each week].

constitutes content-based discrimination and would be subject to first amendment (speech) and equal protection scrutiny." (Marshall, *"We Know It When We See It"*[:] *The Supreme Court and Establishment* (1986) 59 So.Cal.L.Rev. 495, 543, fn. omitted; see also Choper, *The Religion Clauses of the First Amendment, supra,* 41 U.Pitt.L.Rev. at p. 686, fn. omitted ["The Court's apparent inconsistency may be rationalized by concluding that its Establishment Clause principles simply give way in the face of a serious (or even arguably substantial) Free Exercise Clause claim."].) *Tinker* v. *Des Moines School Dist., supra,* 393 U.S. 503 and Education Code section 48907 compel the district to permit distribution of student generated flyers, and the Mission Viejo High School's administration allowed the yearbook to accept commercial advertisements. Thus, both of Professor Marshall's conditions are satisfied in this case. Petitioners' "serious" free exercise argument meets Dean Choper's test as well.

*Zorach* v. *Clauson, supra,* 343 U.S. 306 is an important illustration of a permissible school regulation which attempted to accommodate student and parent initiated religious exercises. There the Supreme Court approved a New York City program permitting public schools to release students to attend religious instruction or services. Although the facts are not directly on point, the court's language appears to be: "We sponsor an attitude on the part of government that shows no partiality to any one group and that lets each flourish according to the zeal of its adherents and the appeal of its dogma. When the state encourages religious instruction or cooperates with religious authorities by adjusting the schedule of public events to sectarian needs, it follows the best of our traditions. For it then respects the religious nature of our people and accommodates the public service to their spiritual needs. To hold that it may not would be to find in the Constitution a requirement that the government show a callous indifference to religious groups. That would be preferring those who believe in no religion over those who do believe. Government may not finance religious groups nor undertake religious instruction nor blend secular and sectarian education nor use secular institutions to force one or some religion on any person. But we find no constitutional requirement which makes it necessary for government to be hostile to religion and to throw its weight against efforts to widen the effective scope of religious influence." (*Id.,* at pp. 313-314 [96 L.Ed. 962].) Nor do I.

*Zorach* is hardly unique in establishment clause jurisprudence. The Supreme Court has frequently upheld laws against such attacks, even where the state has gone beyond accommodation to the point of financial assistance. (*Hobbie* v. *Unemployment Appeals Commission* (1987) 480 U.S. 136 [94 L.Ed.2d 190, 107 S.Ct. 1046]; *Witters* v. *Washington Dept. of Services*

*for Blind* (1986) 474 U.S. 481 [88 L.Ed.2d 846, 106 S.Ct. 748]; *Lynch* v. *Donnelly* (1984) 465 U.S. 668; *Widmar* v. *Vincent, supra,* 454 U.S. 263; *Thomas* v. *Review Bd., Ind. Empl. Sec. Div.* (1981) 450 U.S. 707 [67 L.Ed.2d 624, 101 S.Ct. 1425]; *Wisconsin* v. *Yoder* (1972) 406 U.S. 205 [32 L.Ed.2d 15, 92 S.Ct. 1526]; *Walz* v. *Tax Commission* (1970) 397 U.S. 664 [25 L.Ed.2d 697, 90 S.Ct. 1409]; *Board of Education* v. *Allen* (1968) 392 U.S. 236 [20 L.Ed.2d 1060, 88 S.Ct. 1923]; *Sherbert* v. *Verner* (1963) 374 U.S. 398 [10 L.Ed.2d 965, 83 S.Ct. 1790]; *McGowan* v. *Maryland* (1961) 366 U.S. 420 [6 L.Ed.2d 393, 81 S.Ct. 1101]; *Everson* v. *Board of Education.* (1947) 330 U.S. 1 [91 L.Ed. 711, 67 S.Ct. 504, 168 A.L.R. 1392].)

I am, of course, aware the present case falls somewhere between *Zorach* and those in which religious training was imported into public school classrooms. Here, the flyers were to be distributed in common areas on school grounds during student free time and the advertisement was to appear in a section of the high school yearbook devoted to paid announcements. It cannot fairly be said that either mode of expression was under the supervision or sponsorship of the school in any real sense, however. The flyers were published by students, and the advertisement was written by a student for placement in a portion of the yearbook that *belonged to him* as payment for services as a member of its staff and accepted for publication by the student editor.

The correct interpretation of *Zorach* is this: It is "the combination of classroom and mandatory instruction which was held to be constitutionally impermissible [in *McCollum* v. *Board of Education, supra,* 333 U.S. 203], the implication being, if *accommodation* only was involved, that religious activity could permissibly occur on the school grounds." (*Johnson* v. *Huntington Beach Union High Sch. Dist., supra,* 68 Cal.App.3d at p. 22 (dis. opn. of McDaniel, J.).) One of the leading scholars in the field, Jesse H. Choper, currently Dean of the School of Law at the University of California at Berkeley (Boalt Hall) came to the same conclusion years ago. (Choper, *Religion in the Public Schools: A Proposed Constitutional Standard* (1963) 47 Minn.L.Rev. 329, 351-355.)

No discussion of establishment clause problems can be complete without reference to *Lemon* v. *Kurtzman* (1971) 403 U.S. 602 [29 L.Ed.2d 745, 91 S.Ct. 2105]. There, the United States Supreme Court created a tripartite test to deal with establishment clause issues. Although it has been frequently criticized by dissenters, the "test has been applied in all cases since its adoption in 1971, except in *Marsh* v. *Chambers,* 463 U.S. 783, 77 L.Ed.2d 1019, 103 S.Ct. 3330 (1983), where the Court held that the Nebraska legislature's practice of opening a session with a prayer by a chaplain paid by the

State did not violate the Establishment Clause. The Court based its conclusion in that case on the historical acceptance of the practice. Such a historical approach is not useful in determining the proper roles of church and state in public school, since free public education was virtually nonexistent at the time the Constitution was adopted. [Citations.]" (*Edwards* v. *Aguillard, supra,* 482 U.S. at p. 583, fn. 4 [96 L.Ed.2d at pp. 518-519].)

State action, per *Lemon,* violates the establishment clause if it fails to satisfy *any* of three conditions: It "must have a secular [ ] purpose[,] . . . its . . . primary effect must [ ] neither advance[ ] nor inhibit[ ] religion, [and it] must not foster 'an excessive government entanglement with religion.' " (*Lemon* v. *Kurtzman, supra,* 403 U.S. at pp. 612-613 [29 L.Ed.2d at p. 755].) This test should not be viewed as an absolute, however, "but as a touchstone with which to identify instances where the objectives of the establishment clause have been compromised. [Citation.]" (*Johnson* v. *Huntington Beach Union High Sch. Dist., supra,* 68 Cal.App.3d at p. 11.) The goal of the establishment clause is "to protect against . . . 'sponsorship, financial support, and active involvement of the sovereign in religious activity.' [Citations.]" (*Ibid.*)

The actions taken here violate the first two *Lemons* conditions, apparently in an effort to comply with the third. The district's motives in suppressing the flyers and the advertisement were obviously calculated to restrain petitioners' on-campus religious expression, and there can be no doubt its actions accomplished precisely that. The district argues it had a secular purpose, of course; but at the same time it now defends its decisions in part, as it did previously, on the basis they were necessary to avoid entanglement with religion. These contentions are hopelessly inconsistent in my view.

Nonetheless, assuming no violation of the first two *Lemon* conditions for the sake of argument, I address the "entanglement" claim in light of petitioners' statutory and state constitutional freedom to publish. The district continues to rely on *Johnson,* the case cited in the principals' letters denying circulation of the flyers. The present facts are considerably different, however. There, a student group petitioned for permission to form an official school-sponsored Bible club, requesting use of educational facilities and supervision. Employing the *Lemon* test, the majority of the court concluded operation of the club would advance religion. Noting "the exercise of the power to permit student organizations to conduct their activities on school campuses during the school day in accordance with district rules and regulations is in the abstract secular in nature," the court nevertheless concluded the financial subsidy received by the group in the form of classroom space, heat, light, and a faculty sponsor might be sufficient in itself "to

compel constitutional condemnation of the requested state action." (68 Cal.App.3d at p. 12.)

But the *Johnson* opinion was not based simply on the provision of financial aid. (*Ibid.*) The court was also greatly concerned that the district would be placing "its imprimatur upon the religious activity. [Citations.]" (*Id.,* at p. 13.) The court added, "It is in the foregoing respect that permitting [the] Bible study club to meet and [to] operate on the school campus during the school day most offends establishment principles. Under the district's rules and regulations, the club will become an entity '*sponsored by the school*' and as such will be entitled to use the school name in connection with its activities, to free use of the school premises and property, to access to the school newspaper and school posting facilities to advertise its activities, and to solicit contributions on campus during the school day. Thus, the consequence of permitting the club to operate on campus as a recognized student organization is to place school support and sponsorship behind the religious objectives of the club. The Bible study club would implicitly become an integral part of the school's extracurricular program conducted during the school day when students are compelled by law to attend the school." (*Ibid.,* fn. omitted, italics added.)

The court concluded the club's activities would lead to excessive involvement with religion and could create a "potential for divisiveness" among the students in their religious beliefs: "[T]here is a real possibility that competing sects or beliefs will vie for school permission to operate on campus. Manifestly this could engender student divisiveness in matters of religious beliefs." (*Id.,* at p. 14.)

Our facts are dissimilar, of course. Here we deal only with innocuous and inoffensive writings no student is required to read. The modern high schooler has been besieged from birth with commercial and religious advertisements of all kinds. Television, radio, and newspapers inundate our youth with such material day and night, along with major doses of sleazy sex and gruesome violence. Even the most gullible high school student must have been thoroughly desensitized long ago to a media deluge that is heavily directed to influencing youthful thinking—and spending. Against the backdrop of these realities, the rights of these petitioners to say what they will, in my view, far outweigh the minor inconvenience to fellow students not interested in their message. The latter need only refuse an unwanted flyer or drop it in the trash.

The majority's belief that government officials can prevent a student from handing a piece of paper to another student during a recess simply based on

the allegedly religious nature of the words it contains is without precedent, principled logic, or any serious constitutional justification. It would permit government agents, educators at that, to assume the role of "'thought police' stifling discussion of all but state-approved topics and advocacy of all but the official position." (*Hazelwood School District* v. *Kuhlmeier, supra,* 484 U.S. 260, __ [98 L.Ed.2d 592, 614] (dis. opn. of Brennan, J.).)

Not only does the district have no business inquiring into the content of such materials, despite the limited right to regulate the time, place, and manner of their distribution to prevent interference with its legitimate educational objectives, the district has absolutely no mission to secularize the thinking or expression of its charges. To the contrary, our law, inconsistent as it has been in this area, has almost always sought to accommodate the religious expression of its citizens in the multitude of arenas in which the government must also appear; and this has been true even in the public schools.

When students refuse to participate in the flag salute for religious reasons, the school must tolerate this viewpoint *in the classroom.* (*Board of Education* v. *Barnette, supra,* 319 U.S. 624.) The state must even tolerate the religious heritage of students to the extreme of excusing them from compulsory attendance. (*Wisconsin* v. *Yoder, supra,* 406 U.S. 205.) The correct principle is this: "[*T*]*he Establishment Clause should forbid only government action whose purpose is solely religious and that is likely to impair religious freedom by coercing, compromising, or influencing religious beliefs.*" (Choper, *The Religion Clauses of the First Amendment, supra,* 41 U.Pitt.L.Rev. at p. 675.) This principle should be fully applicable in public schools. (Choper, *Church, State and the Supreme Court: Current Controversy* (1987) 29 Ariz.L.Rev. 551, 554-556.) Here, of course, the only *government* action involved was obviously directed toward the impermissible goal of preventing student religious expression.

Since my colleagues' holding with respect to the flyers is so wide of the constitutional mark, despite giving the matter considerable research, thought, and study, those without similar luxuries are likely to be even more confused. For the benefit of the public at large, and even the usual audience of attorneys and judges, I believe it may be instructive to strip the matter of its legal patina and briefly digress into a few simple illustrations of the grievous error the majority commits today.

Suppose a solitary 18-year-old high school student eating his lunchtime apple under a schoolyard oak. Inspired, for whatever reason, our imaginary scholar has a passing religious thought just as the principal walks by. Good thought policeman that he is, our hypothetical administrator reads the

student's mind and, horrified that school premises are being used for religious purposes, expels the contemplative lad. Lawful? Of course not.

The next day, another 18-year-old student previously unknown to the first sits beside him and begins his lunch. A discussion ensues concerning the same religious idea. The principal overhears this conversation and, horrified again, expels one or both of the students. Lawful? Of course not.

On the third day, the students are more careful. Now they communicate by hastily scrawled notes containing biblical passages which they merely show to each other but do not physically transfer. They are expelled. Is this lawful? Obviously not.

On the fourth day, our scholars pass their notes back and forth. May they be punished for that? Of course not.

On the fifth day, they are less secretive. They allow passing students to satisfy their curiosity by reading the notes over their shoulders. Is this grounds for discipline? The idea is ludicrous.

On the sixth day, the students leave copies of the notes under the tree while they consume their lunch. Other students help themselves to the copies. The principal expels everyone who takes one and, of course, our two imaginary students. The action is clearly improper.

On the seventh day, there is no rest. Buoyed by their success in defeating the principal in six consecutive mandate proceedings, our pious scholars pass out flyers during recess inviting others to meet them under the tree at lunch, which flyers also contain a quotation from the Bible. Every student who receives one is greatly offended and is put to the inconvenience of depositing the flyer in a waste container in order to comply with campus litter regulations. The principal has had enough. This time he orders the students to stop what they are doing, although he can find nothing wrong with the time, place, and manner of their activity. Can he do this? The majority says, "Yes." The Constitution (and I) say, "No."

Of course, I realize that another 30 days' worth of examples might bring us to a full-blown religious service as a daily requirement for all students. A line certainly does exist beyond which petitioners and the district may not pass; but that line is to be drawn at the exact point, although it may not always be easy to find, where the district lends its support, moral or materi-

al, to students seeking to promote religious expression, not where the majority draws it today. The line *might* even be drawn where students seek to distribute material generated by nonstudents, such as the Bible, the Koran, the Book of Mormon, Dianetics, Watchtower, or any other revealed truth or tract produced by outside religious organizations. I regard that as an exceedingly close question, but the one before us today is very much different.

As to the yearbook, its advertisement section contains messages from a major real estate developer, bicycle shop, attorney, hair salon, pet store, ice cream parlor, florist, chiropractor featuring acupressure, orthodontist, auto insurance company, and several student groups that look suspiciously like off-campus clubs, among a number of others.[14] The school district obviously endorses none of these businesses or organizations merely because their messages appear in the book. I cannot imagine who but the most virulent antireligionist could be offended by the inclusion of a New Life ad among such material.

There are also several reasonable options for someone who might find New Life material offensive. The yearbook is hardly required reading; no one has to order the book or retain it if he does. Disfavored pages may be ignored. Nor is it even necessary to retain a page containing any particular advertisement. The ads are all grouped in one section, and any or all could be quickly excised without affecting the remainder of the book. Thus, the yearbook is wholly dissimilar to other activities in which religion is foisted on a captive audience under circumstances where the school might be perceived to sponsor its introduction. (See, e.g., *Bennett* v. *Livermore Unified School Dist.* (1987) 193 Cal.App.3d 1012 [238 Cal.Rptr. 819] and *Collins* v. *Chandler Unified School Dist.* (9th Cir. 1981) 644 F.2d 759, cert. den. *sub nom. Chandler Unified School Dist.* v. *Collins,* 454 U.S. 863 [70 L.Ed.2d 163, 102 S.Ct. 322] [not proper to open assemblies with prayer where such gatherings were part of major school functions requiring faculty supervision and school facilities].)

Moreover, while the yearbook is a limited forum, its advertising section is a public forum because commercial speech has been allowed entry. (*Leeb* v. *DeLong, supra, ante,* at pp. 56-57; *Pines* v. *Tomson* (1984) 160 Cal.App.3d 370 [206 Cal.Rptr. 866]; *San Diego Committee* v. *Governing Bd., supra,* 790

---

[14] *We required augmentation of the record on our own motion to include a copy of the yearbook in its final form. (Code Civ. Proc., § 909.) Neither side accepted our invitation to file an objection to the order, if any it had.*

F.2d at pp. 1476-1478.) Religious worship and discussion are "forms of speech and association protected by the First Amendment" (*Widmar* v. *Vincent, supra,* 454 U.S. at p. 269 [70 L.Ed.2d at p. 447]), and they may be treated no less. (See 20 U.S.C. § 4071 and *Laguna Publishing Co.* v. *Golden Rain Foundation* (1982) 131 Cal.App.3d 816, 841 [182 Cal.Rptr. 813] [discriminatory limitations on free speech on public property not permissible].) In *Widmar* the United States Supreme Court flatly rejected the notion "that 'religious worship' is not speech generally protected by the 'free speech' guarantee of the First Amendment and the 'equal protection' guarantee of the Fourteenth Amendment." (*Widmar* v. *Vincent, supra,* 454 U.S. at p. 274, fn. 6 [70 L.Ed.2d at p. 447].)

I am mindful that the United States Supreme Court "has been particularly vigilant in monitoring compliance with the Establishment Clause in elementary and secondary schools. Families entrust public schools with the education of their children, but condition their trust on the understanding that the classroom will not purposely be used to advance religious views that may conflict with the private beliefs of the student and his or her family. Students in such institutions are impressionable and their attendance is involuntary. [Citations.]" (*Edwards* v. *Aguillard, supra,* 482 U.S. at p. 584 [96 L.Ed.2d at p. 519].)

Nonetheless, as many parents learn to their delight or despair, depending on the perceived qualities of their offspring's friends, it is impossible to isolate students from one another. Here, it is not the district who seeks to influence its charges, but fellow students.[15] And the latter enjoy constitutional freedoms the district does not.

In summary, few of the dangers carefully catalogued in *Johnson* v. *Huntington Beach Union High Sch. Dist., supra,* 68 Cal.App.3d 1 are present here. The flyers required no financial subsidy of any kind. The yearbook ad was purchased by petitioner Read through his own labor on the journal's staff. Moreover, a school does not impliedly approve the content of privately produced flyers or advertisements by simply failing to ban their publication. If the administration is truly troubled by such concerns, it is perfectly

---

[15] "[A]lthough 'you send your child to the schoolmaster . . . 'tis the schoolboys who educate him.' [Emerson, The Conduct of Life (1860) at p. 123.]" (Choper, *Religion in the Schools, supra,* 47 Minn.L.Rev. at p. 416, fn. omitted.) Although Dean Choper would not allow the *state* to "engage" in religion in the schools under his proposed constitutional standard, his definition of "state" does not include the students themselves. (*Id.,* at pp. 330-331, fn. 6.)

free to announce that the law compels student expression on campus within the limits of Education Code section 48907 and that no endorsement of such expression is to be inferred by its compliance with the law. A disclaimer in that vein may also be published in official school publications. (*Hazelwood School District* v. *Kuhlmeier, supra,* 484 U.S. p. at __ [98 L.Ed.2d at p. 617] (dis. opn. of Brennan, J.) [The administration, too, must be permitted access to its own forum.]) In other words, the solution, as it generally is in free speech matters, is not to restrain expression but to answer speech with more speech.

Unlike the situation in *Johnson,* these petitioners sought no official recognition of the New Life discussions in the proceeding below. (See fns. 6 and 10, *ante.*) They did not request use of the schools' names, other than to identify the location of their meetings; nor did they pursue free rein on the school's premises.

*Tinker* v. *Des Moines Independent School Dist., supra,* 393 U.S. 503 provides them solid support. In *Tinker* students protesting the Vietnam War donned black armbands in direct violation of school policy and were suspended until they agreed to remove this apparel. The Supreme Court concluded the school restriction violated the students' constitutional rights to free expression, "at least if it could not be justified by a showing that the students' activities would materially and substantially disrupt the work and discipline of the school. [Citations.]" (*Id.,* at p. 513 [21 L.Ed.2d at p. 742].) The court found the school failed to make such a showing.

Certainly, had the school acted differently in *Tinker* it could not have been accused of endorsing student opposition to the Vietnam War by implication. A similar ill-conceived viewpoint motivated the district here, a viewpoint which either misconstrued a difficult legal point or unnecessarily underestimated the sophistication and intelligence of the typical high school student who "should be able to appreciate that the [school's] policy is one of neutrality toward religion." (*Widmar* v. *Vincent, supra,* 454 U.S. 263, 274, fn. 14 [70 L.Ed.2d 440, 450].) It is at least as important that our schools be politically neutral as it is that they be neutral toward religion, yet *Tinker* protected student political expression of the most controversial sort.

Finally, I am not convinced that the mere distribution of a flyer will lead to student "divisiveness," one of the *Johnson* decision's concerns. The district admits the lunchtime discussions have never caused any disturbance.

How could their mere announcement? Should such "divisiveness" in fact surface, however, the school district could seek to justify the use of censorship at that time, for then it might legitimately claim religion had interfered with the educational mission of the school. Until then it should tolerate the students' right to free thought and expression.

Similarly, there is no evidence the yearbook advertisement or the flyer would materially interfere with the operation of the school or the rights of other students. Nothing in the record suggests students harboring different or opposing viewpoints are, or will be, vexed in any way. In fact, "[t]here is here no evidence whatever of [the student's] interference, actual or nascent, with the schools' work or of collision with the rights of other students to be secure and to be let alone. Accordingly, this case does not concern speech or action that intrudes upon the work of the schools or the rights of other students." (*Tinker* v. *Des Moines Independent School Dist., supra,* 393 U.S. at p. 508 [21 L.Ed.2d at p. 738].)[16]

Moreover, "in our system, undifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression. Any departure from absolute regimentation may cause trouble. Any variation from the majority's opinion may inspire fear. Any word spoken, in class, in the lunchroom, or on the campus, that deviates from the views of another person may start an argument or cause a disturbance. But our Constitution says we must take this risk . . . and our history says that it is this sort of hazardous freedom—this kind of openness—that is the basis of our national strength . . . ." (*Id.,* at pp. 508-509 [21 L.Ed.2d at 739].) Religious speech is entitled to no less forbearance.[17]

---

[16] The school board would, perhaps, be further annoyed by the regeneration of strong community feelings over the matter; but that is hardly a reason to stifle student expression. Elected officials must suffer such difficulties as part of the job; and, in any event, the blame is not, or would not be, attributable to them in this case.

[17] One of the more astute passages I have encountered in the literature on the general subject before us is the following: "With all due respect to the adversaries, the church-state issues that have roiled the courts and the nation have not been earth-shaking matters. They are worrisome only for the same reason that it is desirable to keep the camel's nose outside the tent. But behind the petty quarrels there is a fundamentally important principle at stake, which cannot be too often compromised without being lost. What is at venture in the cases denominated church and state are not the picayune governmental expenditures or religious blasphemies involved in state sponsored religious symbols or school prayers. What is at issue is nothing less than preserving the freedom of the individual mind. The preservation of that freedom is the reason behind the first amendment, not only its religion clauses but its speech and press and petition and assembly provisions as well. And in this area, the greatest danger lies in the attempts by adults, who have closed their own minds, to close the minds of others, especially children, through the instruments of government sanctions. Of course, the young

The bigotry involved in the suppression of purely private student religious expression cannot be reconciled with any of the clauses of the First Amendment. It is as offensive to the establishment clause as any of them. The majority does not bar entry of the camel's nose of religion into a public institution by today's decision. New Life meetings presumably go on. But the majority does allow the whole camel to intrude into the students' tent of free expression. I would reverse and order a writ to issue consistent with the views expressed above.

On February 19, 1988, the opinion was modified to read as printed above. Appellants' petition for review by the Supreme Court was denied April 27, 1988. Broussard, J., was of the opinion that the petition should be granted.

---

are the most vulnerable to indoctrination. But the histories of every European nation, some well into the twentieth century, and not excluding England, have taught us that it is not only the young who are vulnerable to the coercion of religious bigotry. [¶] It is the constitutional objective of freedom of the mind that should inform the construction of the application of the constitutional provisions that come before the Court. Principled decisions, not what Mr. Justice Schaefer used to call 'pots and pans jurisprudence,' must be its guide." (Kurland, *Religion and the Constitution: "Eternal Hostility Against Every Form of Tyranny Over the Mind of Man"* (1987) 20 U.C. Davis L.Rev. 705, 717.)

APPENDIX

2 COR 5:17
"Therefore if any man is in Christ he is a new creature; the old things have passed away; behold new things have come."

.... AND ITS FUN!

COME ...JOIN US AT THE STEPS OF THE P.A.T. EVERY WED. AT LUNCH.

021

EXHIBIT

New Life at ETHS

come one
come all

Christ is born - God kept 4 his promise!

ARE YOU INTERESTED IN STUDING THE BIBLE ?

MEETING WITH OTHER CHRISTIANS AT SCHOOL ?

PRAYING FOR THE NEEDS OF OTHERS WHILE THEY PRAY FOR YOUR NEEDS ?

DEL TACO CAN WAIT, COME...

We meet every Tuesday
and Thursday on the
grass in front of
the Library at Lunch.
When it rains we go into
Mr. Vicker's Biology classroom

EXHIBIT C, Page 4

026

EXHIBIT