[No. A029496. First Dist., Div. One. July 24, 1987.]

LESLIE ANN BENNETT et al., Plaintiffs and Respondents, v. LIVERMORE UNIFIED SCHOOL DISTRICT et al., Defendants and Appellants.

COUNSEL

Richard J. Moore, County Counsel, William E. Rundstrom and Dianna Thurston, Deputy County Counsel, for Defendants and Appellants.

Margaret C. Crosby, Alan L. Schlosser, Edward M. Chen and Matthew A. Coles for Plaintiffs and Respondents.

Amy Adelson, Lois C. Waldman and Marc D. Stern as Amici Curae on behalf of Plaintiffs and Respondents.

OPINION

ELKINGTON, J.—Leslie Ann Bennett, a high school senior at Granada High School in the Livermore Unified School District (School District), and Wilbur Miller, a Livermore taxpayer, obtained judgment from the superior court declaring unconstitutional, under both state and federal Constitutions, the inclusion of a religious invocation in Granada High School graduation ceremonies. The court further enjoined the School District from including an invocation in scheduled and future graduation ceremonies.

The School District appeals.

The instant action was filed after Bennett and two of her classmates were unable to convince their high school grievance committee and the directors of the School District to overrule the decision of the high school's graduation committee to include a religious invocation at their graduation ceremony.

The Granada graduation ceremony is a school-sponsored event, held upon school property purchased with tax funds. Attendance of the ceremony by students and faculty is essentially voluntary,[1] although members of the administration are required to attend. The School District, which establishes the guidelines for the ceremony does not require that an invocation be given. An invocation, however, is traditional and has been included in the graduation ceremony of every school in the district since at least 1973. The invocation is delivered either by a visiting clergyman or by a student. The district provides no specific guidelines for the invocation's content, although when a student is selected to give the invocation, a faculty advisor is assigned to assist the student.

An invocation, however, by definition is "a form of prayer invoking God's presence." (Random House Dict. of the English Language (1967).) Indeed, it was stipulated that Granada High School's invocation traditionally referred to an Almighty God. But the citizens of this country, and perhaps of this state in particular, are a people of highly diverse cultural, ethical and religious backgrounds.[2] And we note that as the court found in *Torcaso* v. *Watkins* (1961) 367 U.S. 488, 495, fn. 11 [6 L.Ed.2d 982, 987, 81 S.Ct. 1680], "Among religions in this country which do not teach what would generally be considered a belief in the existence of God are Buddhism, Taoism, Ethical Culture, Secular Humanism, and others." Any religious invocation, and certainly any invocation including a reference to God, therefore almost necessarily will not comport with the beliefs of a number of those persons present, and may in fact be offensive to some.

---

[1] Although attendance at the ceremony by the students is not mandatory, Bennett in a declaration filed with the superior court testified as to the personal importance she attached to the event, and we are convinced that most high school students view their graduation as a highly important ceremony which is not lightly to be missed.

[2] We take judicial notice of the school population statistics set forth in Fingertip Facts on Education in California, Department of Education (1985) at page 1:

| | Number | Percentage |
|---|---|---|
| American Indian or Alaskan Native | 31,675 | 0.8 |
| Asian or Pacific Islander | 276,966 | 6.7 |
| Filipino | 76,516 | 1.8 |
| Hispanic | 1,158,668 | 27.9 |
| Black, not Hispanic | 401,986 | 9.7 |
| White, not Hispanic | 2,205,299 | 53.1 |

Indeed, the scheduled invocation patently was offensive to Bennett, and to the minority of students who joined her in protesting its inclusion.

This appears to be a case of first impression in California, although other state courts have decided similiar actions, reaching differing conclusions.

■ Although we agree with the School District that the once yearly, brief religious exercise at issue here is not a particularly egregious intrusion of the state into religious activities, the applicable law compels the conclusion that it is *not* acceptable. We therefore align ourselves with those cases holding *impermissible* the inclusion of an invocation at a public school graduation ceremony, finding that it violates both the United States and the California Constitutions.

■ A graduation ceremony, as an administrative act, must comport with state and federal constitutional standards. (*Johnson* v. *Huntington Beach Union High Sch. Dist.* (1977) 68 Cal.App.3d 1, 11 [137 Cal.Rptr. 43].)

The First Amendment of the United States Constitution decrees, "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . . ."

■ The Amendment is made applicable to the states through the Fourteenth Amendment (*Abington School Dist.* v. *Schempp* (1963) 374 U.S. 203, 215 [10 L.Ed.2d 844, 854, 83 S.Ct. 1560]).

California's Constitution, however, in provisions not dependent upon the federal Constitution (Cal. Const., art. I, §§ 4, 24,) expresses the same sentiments: "Free exercise and enjoyment of religion without discrimination or preference are guaranteed. . . . The Legislature shall make no law respecting an establishment of religion." (Cal. Const., art. I, § 4.)

■ But California's constitutional provisions are more comprehensive than those of the federal Constitution (*Fox* v. *City of Los Angeles* (1978) 22 Cal.3d 792, 796 [150 Cal.Rptr. 867, 587 P.2d 663]), and particularly so in the area of involvement of religion in schools. Thus, article XVI, section 5, in providing that "Neither the Legislature, nor any county, city and county, township, school district, or other municipal corporation, shall ever make an appropriation, or pay from any public fund whatever, or grant anything to or in aid of any religious sect, church, creed, or sectarian purpose to help or to support or sustain any school, college, university . . . ," "forbids more than the appropriation or payment of public funds to support sectarian institutions. It bans any official involvement, whatever its form, which

has the direct, immediate, and substantial effect of promoting religious purposes." (*California Educational Facilities Authority* v. *Priest* (1974) 12 Cal.3d 593, 605, fn. 12 [116 Cal.Rptr. 361, 526 P.2d 513].) And article IX, section 8, provides, "No public money shall ever be appropriated for the support of any sectarian or denominational school, or any school not under the exclusive control of the officers of the public schools; nor shall any sectarian or denominational doctrine be taught, or instruction thereon be permitted, directly or indirectly, in any of the common schools of this State."

■ "With certain exceptions not here relevant, California courts alone determine the rights guaranteed by the California Constitution so long as those rights extend equal or greater protection to those guaranteed by the federal Constitution under totally similar provisions of the Bill of Rights. (*Mandel* v. *Hodges* (1976) 54 Cal.App.3d 596, 616 [127 Cal.Rptr. 244, 90 A.L.R.3d 728].)" (*Feminist Women's Health Center, Inc.* v. *Philibosian* (1984) 157 Cal.App.3d 1076, 1086 [203 Cal.Rptr. 918].) However, there are few cases which discuss California's constitutional prohibition against the interaction of state and church. Therefore, although "we examine the constitutionality of the proposed action on independent state grounds . . . we also consult principles of federal cases as they seem compelling guides to uncharted state grounds." (*Id.,* at p. 1086.)

The United States Supreme Court has long interpreted the First Amendment as commanding an *absolute* separation of church and state. We quote from but a few of many cases.

"Neither a state nor the Federal Government can, openly or secretly, participate in the affairs of any religious organizations or groups and *vice versa.* In the words of Jefferson, the clause against establishment of religion by law was intended to erect 'a wall of separation between church and state.'" (*Everson* v. *Board of Education* (1947) 330 U.S. 1, 16 [91 L.Ed. 711, 723, 67 S.Ct. 504, 168 A.L.R 1392].)

" 'There is no answer to the proposition . . . that the effect of the religious freedom Amendment to our Constitution was to take every form of propagation of religion out of the realm of things which could directly or indirectly be made public business and thereby be supported in whole or in part at taxpayers' expense. . . . This freedom was first in the Bill of Rights because it was first in the forefathers' minds; it was set forth in absolute terms, and its strength is its rigidity.' . . . 'The [First] Amendment's purpose was not to strike merely at the official establishment of a single sect, creed or religion, outlawing only a formal relation such as had prevailed in England and some of the colonies. Necessarily it was to uproot all such

relationships. But the object was broader than separating church and state in this narrow sense. It was to create a complete and permanent separation of the spheres of religious activity and civil authority by comprehensively forbidding every form of public aid or support for religion.'" (*Abington School Dist.* v. *Schempp, supra,* 374 U.S. 203, 216-217 [10 L.Ed.2d 844, 855].)

" 'We repeat and again reaffirm that neither a State nor the Federal Government can constitutionally force a person "to profess a belief or disbelief in any religion." Neither can constitutionally pass laws or impose requirements which aid all religions as against non-believers, and neither can aid those religions based on a belief in the existence of God as against those religions founded on different beliefs.' " (*Wallace* v. *Jaffree* (1985) 472 U.S. 38, 53, fn. 37 [86 L.Ed.2d 29, 41, 105 S.Ct. 2479, 2488].)

And, "[t]he Court has been particularly vigilant in monitoring compliance with the Establishment Clause in elementary and secondary schools." (*Edwards* v. *Aguillard* (1987) 482 U.S. 578, __ [96 L.Ed.2d 510, 519, 107 S.Ct. 2573].) Thus, the Supreme Court consistently has rejected any form of prayer, however inoffensive or nonsectarian, in the public schools. (See *Engel* v. *Vitale* (1962) 370 U.S. 421 [8 L.Ed.2d 601, 82 S.Ct. 1261, 86 A.L.R.2d 1285]; *Abington School Dist.* v. *Schempp, supra,* 374 U.S. 203; *Karen B.* v. *Treen* (5th Cir. 1981) 653 F.2d 897, *affd.* 455 U.S. 913 [71 L.Ed.2d 455, 102 S.Ct. 1267] (1982); *Wallace* v. *Jaffree, supra,* 472 U.S. 38, [86 L.Ed.2d 29, 105 S.Ct. 2479].)

In light of the recent reaffirmation of the court of its traditional analysis of the First Amendment prohibitions, we find unpersuasive—at least in the area of the public schools—the School District's argument that the current court has departed from its set stance and has determined that a greater degree of church and state interaction is permissible than was previously allowed.

Thus, in striking down a statute which provided for a minute of silence in the public schools, "for meditation or prayer," the court recently held, "As is plain from its text, the First Amendment was adopted to curtail the power of Congress to interfere with the individual's freedom to believe, to worship, and to express himself in accordance with the dictates of his own conscience. . . . This Court has confirmed and endorsed this elementary proposition of law time and time again." (*Wallace* v. *Jaffree, supra,* 472 U.S. 38, 49 [86 L.Ed.2d 29, 38-39, 105 S.Ct. 2479, 2486].)

And in language particularly relevant to the issue in the present case, the court confirmed that the freedom to believe and to worship included the freedom not to engage in the religious practices of the majority.

" 'We begin with the proposition that the right of freedom of thought protected by the First Amendment against state action includes both the right to speak freely and the right to refrain from speaking at all. [Citations.] A system which secures the right to proselytize religious, political, and ideological causes must also guarantee the concomitant right to decline to foster such concepts. The right to speak and the right to refrain from speaking are complementary components of the broader concept of "individual freedom of mind." ' [Citation.] . . .

"Just as the right to speak and the right to refrain from speaking are complementary components of a broader concept of individual freedom of mind, so also the individual's freedom to choose his own creed is the counterpart of his right to refrain from accepting the creed established by the majority. At one time it was thought that this right merely proscribed the preference of one Christian sect over another, but would not require equal respect for the conscience of the infidel, the atheist, or the adherent of a non-Christian faith such as Mohammedism or Judaism. But when the underlying principle has been examined in the crucible of litigation, the Court has unambiguously concluded that the individual freedom of conscience protected by the First Amendment embraces the right to select any religious faith or none at all." (*Id.,* 472 U.S. at pp. 52-53 [86 L.Ed.2d at pp.40-41, 105 S.Ct. at pp. 2487-2488].)

(And see also *Stone* v. *Graham* (1980) 449 U.S. 39 [66 L.Ed.2d 199, 101 S.Ct. 192], *Karen B.* v. *Treen, supra,* 653 F.2d 897, aff'd at 455 U.S. 913, and *Edwards* v. *Aguillard, supra,* 482 U.S. 578 at p. __ [96 L.Ed.2d 510 at p. 520].)

However, as the School District emphasizes, absolute separation of church and state is in fact not possible in a country founded in large part upon religious principles, and by people with strong religious beliefs. A free practice of religion requires at least state protection, if not positive action, to avoid interference (*Zorach* v. *Clauson* (1952) 343 U.S. 306, 312 [96 L.Ed. 954, 961, 72 S.Ct. 679]) and many activities which were once religious have become secular through repetition and tradition. (*Id.,* at p. 314 [96 L.Ed. at p. 962].) ■ The First Amendment is not construed so as to prohibit a secular activity merely because it contains some language of religion or has its roots in what was once a religious practice. Consequently a three-part test has been developed against which, and taking into consideration the strong construction given the First Amendment, an avowedly secular activity must be measured in order to withstand First Amendment scrutiny: First, the state action must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion, and third, the statute must not foster an excessive entanglement

with religion. (*Lemon* v. *Kurtzman* (1971) 403 U.S. 602, 612-613 [29 L.Ed.2d 745, 755-756, 91 S.Ct. 2105]; *Edwards* v. *Aguillard, supra,* 482 U.S. 578 at p. __ [96 L.Ed.2d 510 at p. 521].) Moreover, "[I]f a [state action] violates any of these three principles, it must be struck down under the Establishment Clause." (*Stone* v. *Graham, supra,* 449 U.S. 39, 40-41 [66 L.Ed.2d 199, 202].)

And California, too, has adopted this three-part test. (*Johnson* v. *Huntington Beach Union Hign Sch. Dist., supra,* 68 Cal.App.3d 1, 11.)

■■■ There is no question but that the primary purpose of a religious invocation is religious. Thus, as to the *first* prong of the three-part test, it is necessary only to cite the Supreme Court's approval of the reasoning of the circuit court in *Karen B.* v. *Treen, supra,* 653 F.2d 897, 901, that " 'prayer is a primary religious activity in itself.' " (*Wallace* v. *Jaffree, supra,* 472 U.S. at p. 43, fn. 22 [86 L.Ed.2d at p. 35, 105 S.Ct. at p. 2483].)

Having determined that the first prong of the test has *not* been met, we need go no further (*Edwards* v. *Aguillard, supra,* 482 U.S. at p. __ [96 L.Ed.2d at p. 520 ].) We nonetheless consider the second and third prongs of the *Lemon* test.

■■■ The Supreme Court recently described the *second* prong of the three-part test as asking " ' . . . whether, irrespective of government's actual purpose, the practice under review in fact conveys a message of endorsement or disapproval. An affirmative answer to either question should render the challenged practice invalid.' " (*Wallace* v. *Jaffree, supra,* 472 U.S. at p. 56, fn. 42 [86 L.Ed.2d at p. 43, 105 S.Ct. at p. 2490].) ■■■ The practice of including a religious invocation in a graduation ceremony conveys a message of endorsement of the particular creed represented in the invocation, and of religion in general.

And the School District here admits that should we hold some forms of religious invocation permissible, it will be necessary to oversee the students' choice of ceremony to ensure that the limits set here are not exceeded. It is just this kind of surveillance which causes the entanglement condemned in the third part of the *Lemon* test. (*Lemon* v. *Kurtzman, supra,* 403 U.S. at p. 619 [29 L.Ed.2d at pp. 759-760].)

We therefore conclude that the state action at issue violates *all three* parts of the *Lemon* test, and hold that the inclusion of a religious invocation at a high school graduation violates the First Amendment.

It is no argument that the prayer at issue might be nondenominational, or that attendance at the graduation ceremony is arguably voluntary. (*Abing-*

*ton School Dist.* v. *Schempp, supra,* 374 U.S. at pp. 224-225 [10 L.Ed.2d at pp. 859-860]; *Engel* v. *Vitale, supra,* 370 U.S. at p. 430 [8 L.Ed.2d at pp. 607-608].) Nor is it relevant that the prayer is brief or general. "Further it is no defense to urge that the religious practices here may be relatively minor encroachments on the First Amendment. The breach of neutrality that is today a trickling stream may all too soon become a raging torrent and, in the words of Madison, 'it is proper to take alarm at the first experiment on our liberties.'" (*Abington School Dist.* v. *Schempp, supra,* 374 U.S. at p. 225 [10 L.Ed.2d at pp. 859-860]; and see *Engel* v. *Vitale, supra,* 370 U.S. at p. 430 [8 L.Ed.2d at pp. 607-608], and *Wallace* v. *Jaffree, supra,* 472 U.S. at p. 40, fn. 3 [86 L.Ed.2d at pp. 33-34, 105 S.Ct. at p. 2489].)

We address the several cases cited by the School District through which it argues that a prayer during a high school graduation ceremony is somehow exempt from the law prohibiting prayer in the public schools.

The first of these is *Widmar* v. *Vincent* (1981) 454 U.S. 263 [70 L.Ed.2d 440, 102 S.Ct. 269], in which the court found that a college, in creating a forum open to student meetings upon payment of a fee towards the defrayment of school costs, could not discriminate against a student group which intended to use the forum for religious meetings. Several facts distinguish the situation in *Widmar* from that of the present case. The cost to the public was minimal. The "forum" which was simply a room made available to student groups, was located on a college campus rather than on high school grounds. But most significant is that the meetings carried no taint of school sponsorship. The college merely provided space which any group might use to discuss whatever issues of particular interest to it; i.e.,—the religious activity was not a part of a school-sponsored function, following guidelines generally established by the administration and attended by a significant portion of the student body including persons desiring the inclusion of no religious activity. There is a vast difference between sanctioning a prayer during an official school event and refusing to discriminate against religious groups in the use of an open forum.

"It is neither sacrilegious nor antireligious to say that each separate government in this country should stay out of the business of writing or sanctioning official prayers and leave that purely religious function to the people themselves and to those the people choose to look to for guidance." (*Engel* v. *Vitale, supra,* 370 U.S. at p. 435 [8 L.Ed.2d at p. 610].)

■ Furthermore, irrespective of the federal Constitution and of *Widmar's* potential application to high school activities, it is settled that *California's* Constitution does not permit the use of high school facilities as a meeting place for student religious activities. Such a use would both result

in both state financing of religion—in the form of providing space, heat and light for the meetings—and in impermissibly placing the state's imprimatur upon the religious activity. (*Johnson* v. *Huntington Beach Union High Sch. Dist., supra,* 68 Cal.App.3d 1.)[3]

The decision in *Lynch* v. *Donnelly* (1984) 465 U.S. 668 [79 L.Ed.2d 604, 104 S.Ct. 1355], we find to be nothing more than a reiteration of the principles stated in earlier cases that just as religion should not be established, it should not be discriminated against, and that it is constitutionally permissible for the state to recognize the religious underpinnings of some of our nation's traditions.

Thus it was held there that the inclusion of a crèche scene in a city Christmas display containing many other, nonreligious figures symbolic of the holiday, was nothing more than the recognition by the city of the origins of the holiday, and was in fact, analogous to the display of religious paintings in a public museum. And it must be emphasized that the court in *Lynch* expressly distinguished from its facts and holding those cases finding impermissible the inclusion of religious activities in public schools. (*Id.,* at pp. 682-683 [79 L.Ed.2d at pp. 615-616].)

Finally, in *Marsh* v. *Chambers* (1984) 463 U.S. 783 [77 L.Ed.2d 1019, 103 S.Ct. 3330], the court, again finding constitutionally permissible activity which, once religious, has become secularized, upheld the practice of opening *legislative* sessions with prayer. But even there the court carefully limited its holding to the exact situation before it, finding that because of its unique history the practice *in fact* presented no more potential for establishment than others specifically upheld in earlier decisions. "The opening of sessions of legislative and other deliberative public bodies with prayer is deeply embedded in the history and tradition of this country. From colonial times through the founding of the Republic and ever since, the practice of legislative prayer has coexisted with the principles of disestablishment and religious freedom . . . the First Congress, as one of its early items of business, adopted the policy of selecting a chaplain to open each session with prayer. . . ." (*Marsh* v. *Chambers, supra,* 463 U.S at pp. 786-788 [77 L.Ed.2d at pp. 1024-1025].) Thus, the decision rested on an understanding that the purpose of a legislative invocation is not to inject religion into a state function, but to honor those persons who founded this country by continuing a practice specifically established by them.

---

[3] The decision in *Johnson* v. *Huntington Beach Union High Sch. Dist.* rested on both federal and state constitutional grounds. We are not convinced that *Johnson*'s interpretation of the federal Constitution fails to survive *Widmar,* but in all events its interpretation of California's Constitution remains untouched.

And by its very careful discussion of the history of legislative invocations the court manifestly intended its holding to be applied to no practice less steeped in history. But our Founding Fathers made no provision for graduation invocations; indeed, public schools were not a fact of American life until nearly a century later ( Butts, A History of Education in American Culture (1953) p. 167).

And as it did in *Lynch* v. *Donnelly, supra,* 465 U.S. 668, the court scrupulously distinguished its holding from those involving school activities, noting, among other things, "Here, the individual claiming injury by the practice is an adult, presumably not readily susceptible to 'religious indoctrination.'" (*Marsh* v. *Chambers, supra,* 463 U.S. at p. 792 [77 L.Ed.2d at p. 1028].) (We recognize, of course, that many high school seniors are legal adults. We are not persuaded, however, that in so recently achieving adult status these teenagers have also achieved the same lack of susceptibility attributed to our legislators.)

We find nothing in the cited cases which indicates an intention by the Supreme Court to stray from its established interpretation of the First Amendment. And we find support in our belief in the observations of the court in the latest of its expressions on the subject.

Thus, in *Wallace* v. *Jaffree, supra,* 472 U.S. 38 [86 L.Ed.2d 29, 105 S.Ct. 2479], the court, emphasizing that the state's interest in "forestalling intolerance extends beyond intolerance among Christian sects—or even intolerance among 'religions'—to encompass intolerance of the disbeliever and the uncertain," (*id.,* at p. 54 [86 L.Ed.2d at p. 42, 105 S.Ct. at p. 2489]), quoted from its earlier opinion in *Board of Education* v. *Barnette* (1943) 319 U.S. 624, 640-641 [87 L.Ed. 1628, 1638-1639, 63 S.Ct. 1178]: "'Probably no deeper division of our people could proceed from any provocation than from finding it necessary to choose what doctrine and whose program public educational officials shall compel youth to unite in embracing.'" (*Wallace* v. *Jaffree, supra,* 472 U.S. at pp. 54-55, fn. 39 [86 L.Ed.2d at p. 42, 105 S.Ct. at p. 2489.)

"Furthermore, '[t]he public school is at once the symbol of our democracy and the most pervasive means for promoting our common destiny. In no activity of the State is it more vital to keep out devisive forces than in our schools . . .' *Illinois ex rel. McCollum* v. *Board of Education,* 333 U.S. 203, 231 (1948) (opinion of Frankfurter, J.)." (*Edwards* v. *Aguillard, supra,* 482 U.S. 578 at p. __ [96 L.Ed.2d at p. 519].)

And, noting that in *Marsh* v. *Chambers* it had distinguished "Between adults not susceptible to 'religious indoctrination' and children subject to

'peer pressure,'" the court reiterated its holding in *Board of Education* v. *Barnette, supra,* 319 U.S. at p. 637 [87 L.Ed. at p. 1637]: "That [Boards of Education] are educating the young for citizenship is reason for scrupulous protection of Constitutional freedoms of the individual, if we are not to strangle the free mind at its source and teach youth to discount important principles of our government as mere platitudes." (*Wallace* v. *Jaffree, supra,* at pp. 60-61, fn. 51 [86 L.Ed.2d at p. 46, 105 S.Ct. at p. 2492].)

We are not persuaded that the cases cited by the School District demand a conclusion other than that which we have reached.

 And for all of the reasons we have stated we hold further that the inclusion of an invocation in high school graduation ceremonies violates the even more stringent prohibitions of California's Constitution.

The judgment is affirmed.

Racanelli, P. J., and Newsom, J., concurred.

A petition for a rehearing was denied August 21, 1987, and appellants' petition for review by the Supreme Court was denied October 22, 1987.