ORDER CERTIFYING QUESTIONS TO THE SUPREME COURT OF CALIFORNIA
ORDER
We respectfully request the California Supreme Court to exercise its discretion and decide the certified questions presented below. See Cal. R. Ct. 29.8. The reso *1041 lution of any one of these questions could determine the outcome of this appeal and no controlling California precedent exists. See id. We are aware of the California Supreme Court’s demanding caseload and recognize that our request adds to that load. But we feel compelled to request certification because this case raises difficult questions of state constitutional law with potentially broad implications for California citizens’ civil and religious liberties. Considerations of comity and federalism favor the resolution of such questions by the State’s highest court rather than this court.
I.Questions Certified
The Desert Pacific Council, a nonprofit corporation chartered by the Boy Scouts of America, leases land from the City of San Diego in Balboa Park and Mission Bay Park. The Council pays no rent for the Mission Bay property and $1 per year in rent for the Balboa Park property. In return, the Council operates Balboa Park’s campground and Mission Bay Park’s Youth Aquatic Center. The campground and the Aquatic Center are public facilities, but the Council maintains its headquarters on the campground, and its members extensively use both facilities. The Boy Scouts of America — and in turn the Council — prohibit atheists, agnostics, and homosexuals from being members or volunteers and requires members to affirm a belief in God.
The plaintiffs are users of the two Parks who are, respectively, lesbians and agnostics. They would use the land or facilities leased by the Desert Pacific Council but for the Council’s and Boy Scouts’ discriminatory policies.
We certify to the California Supreme Court the following questions:
1. Do the leases interfere with the free exercise and enjoyment of religion by granting preference for a religious organization in violation of the No Preference Clause in article I, section 4 of the California Constitution?
2. Are the leases “aid” for purposes of the No Aid Clause of article XVI, section 5 of the California Constitution?
3. If the leases are aid, are they benefiting a “creed” or “sectarian purpose” in violation of the No Aid Clause?
The California Supreme Court is not bound by this court’s presentation of the questions. We will accept a reformulation of the questions and will accept the Supreme Court’s decision. To aid the Supreme Court in deciding whether to accept the certification, we provide the following statement of facts, jurisdictional analysis, and explanation.
II. Statement of Facts
The Desert Pacific Council is a nonprofit corporation chartered by The Boy Scouts of America to administer Scouting programs in the San Diego area. The Council must adhere to the Boy Scouts’ policies and rules. These rules include a prohibition against allowing youths or adults who are atheists, agnostics, or homosexuals to be members or volunteers. Cf. Boy Scouts of Am. v. Dale, 530 U.S. 640, 659, 120 S.Ct. 2446, 147 L.Ed.2d 554 (2000) (holding that the Boy Scouts has a constitutional right to exclude homosexuals). The Boy Scouts maintains that agnosticism, atheism, and homosexuality are inconsistent with its goals and with the obligations of its members. See Randall v. Orange County Council, Boy Scouts of Am., 17 Cal.4th 736, 742, 72 Cal.Rptr.2d 453, 952 P.2d 261 (1998) (reciting that, in defending its right to exclude atheists, the Boy Scouts introduced “evidence intended to establish that requiring the inclusion of nonbelievers ... would interfere with the organization’s ef *1042 forts to convey its religious message”). The organization’s mission is “to prepare young people to make ethical choices over their lifetimes by instilling in them the values of the Scout Oath and Law.” [ER 2003 ¶ 162.] As part of the Scout Oath, each member and volunteer must pledge to “do my best ... [t]o do my duty to God and my country” and to remain “morally straight.” [Id. 2005 ¶ 176.] Duty to God is placed first in the Oath because it is “the most important of all Scouting values.” [Id. 2004 ¶ 170.] Members also must agree to uphold the “Scout Law,” which provides that Scouts are “Reverent” and “Clean.” [Id. 2005 ¶ 176-77.] Membership and leadership applications contain a “Declaration of Religious Principle,” which explains that “no member can grow into the best kind of citizen without recognizing an obligation to God.” [Id. 1535.] The Boy Scouts instructs leaders to “be positive in their religious influence and ... [to] encourage Scouts to earn the religious emblem of them faith.” [Id. 1527.]
The plaintiffs Barnes-Wallaees are a lesbian couple and the plaintiffs Breens are agnostics. Because of their sexual and religious orientations, they cannot be Boy Scout volunteers. Both couples have sons old enough to join the Boy Scouts, and they would like them sons to use the leased facilities, but the parents refuse to give the approval required for membership. As part of the membership application, parents must promise to assist their sons “in observing the policies of the Boy Scouts of America ... [to] serve as his adult partner and participate in all meetings and approve his advancement.” [Id. 1533.] The application also includes the Scout Law and the Declaration of Religious Principle. The Barnes-Wallaees and the Breens believe the Boy Scouts’ policies are discriminatory, and they refuse to condone such practices by allowing their children to join.
In the plaintiffs’ hometown of San Diego, the Desert Pacific Council leases, occupies, and operates portions of two popular city parks extensively used by the plaintiff families. The Council leases from the City sixteen acres in Balboa Park known as Camp Balboa. Camp Balboa offers a “unique” urban camping opportunity in the “heart of the City.” [Id. 1966 ¶ 7.] The site includes campgrounds, a swimming pool, an amphitheater, a program lodge, a picnic area, a ham radio room, restrooms and showers, and a camp ranger office. Under the original lease, the Council paid $1 per year in rent. In 2002 the parties entered into a new twenty-five-year lease, which requires the Desert Pacific Council to pay $1 in annual rent and a $2,500 annual administration fee, and to expend at least $1.7 million for capital improvements over seven years.
The Desert Pacific Council makes exclusive use of portions of Balboa Park for its own benefit. The Council has its headquarters on park property. From this facility it oversees its $3.7 million budget, manages its thirty employees, and processes applications for membership and leadership positions. The Council has a print shop on park land that it uses to print literature for its members. These portions of the park are unavailable for public use. The Council also controls Camp Balboa’s reservations. It pencils in reservations as far in advance as it wishes and then advertises the pre-reserved times to its members. The Council can declare the camp “closed,” determine how many people are going to attend the camps, and then open up only the unreserved facilities to the public.[1]
*1043 The Council also leases land on Fiesta Island in Mission Bay Park. In 1987, the City entered into a twenty-five-year, rent-free lease with the Desert Pacific Council for one-half acre of waterfront property on Fiesta Island. The City entered into this lease after the Desert Pacific Council approached it about building and operating an aquatic center on the island. The Council was awarded the lease on the condition that it expend $1.5 million to build the Youth Aquatic Center. The Council built and now operates the Aquatic Center, which offers boating, sailing, canoeing, and kayaking to San Diego youth.
Unlike Camp Balboa, the Aquatic Center has a formal first-come, first-served policy, but the policy has exceptions for Scout members. The Desert Pacific Council is permitted to reserve up to 75% of the facilities seven days in advance. The Council also hosts a members-only camp for four weeks each summer. The reservation books during camp say “YAC Closed for Summer Camp.” The public cannot use the Aquatic Center during summer camp for water-based activities, but can reserve dormitories or other facilities the Scouts are not using.
The plaintiff families brought this action against the City of San Diego, the Boy Scouts, and the Desert Pacific Council, alleging that leasing public land to an organization that excludes persons because of their religious and sexual orientations violates the federal Establishment Clause, the California Constitution’s No Preference[2] and No Aid[3] Clauses, the Federal and State Equal Protection Clauses, the San Diego Human Dignity Ordinance, and state contract law. The district court found the families had standing as municipal taxpayers and then allowed them to file an amended complaint. Both parties sought summary judgment. The court found that the leases violated the federal Establishment Clause and the California No Aid and No Preference Clauses and granted summary judgment in the families’ favor. Barnes-Wallace v. Boy Scouts of Am., 275 F.Supp.2d 1259, 1276-80 (S.D.Cal.2003). In the amended final judgment, the court enjoined the Balboa Park and Fiesta Island leases. The City then notified the Council that under the terms of the 2002 Balboa Park lease, the term tenancy was terminated and converted to a month-to-month tenancy. The families have since settled with the City. The Scout defendants appealed the district court’s ruling.
*1044 III. Jurisdictional Analysis
Before proceeding further, we must satisfy ourselves that we have jurisdiction over this appeal. We have statutory jurisdiction over the appeal under 28 U.S.C. § 1291, but the parties have presented challenges to the existence of a case or controversy that is essential to our constitutional jurisdiction under Article III. See Harrison W. Corp. v. United States, 792 F.2d 1391, 1392 (9th Cir.1986). We address these issues as threshold matters.
1. Mootness
The plaintiffs argue that the appeal is moot as to the Balboa Park lease because the City terminated the lease after the district court’s final judgment. The appeal is not moot because the Desert Pacific Council still has “a legally cognizable interest for which the courts can grant a remedy.” Alaska Ctr. for Env’t v. U.S. Forest Service, 189 F.3d 851, 854 (9th Cir.1999). The City did not terminate the Desert Pacific Council’s tenancy, but rather converted it to a month-to-month, holdover tenancy. [ER 804.] The Council still occupies Camp Balboa, and the permissibility of its tenancy remains at issue in this appeal. Moreover, the City’s notice terminating the lease indicated that, if the district court’s judgment is reversed, the termination notice will be of no effect. The controversy with regard to the Balboa Park lease is not moot.
2. Standing
The Boy Scouts challenges the standing of plaintiffs to bring this action. See Lujan v. Defenders of Wildlife, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (explaining that standing is a component of the case-or-controversy requirement). Because the case was decided on summary judgment in the district court, the plaintiffs had the burden of showing by uncontroverted facts that they had standing to challenge the leases. See id. at 561, 112 S.Ct. 2130. We conclude that the plaintiffs have sustained that burden, but we base standing on a different ground from that adopted by the district court.
The Barnes-Wallaces and the Breens have standing to pursue their claims because uncontroverted evidence shows that they suffered injuries in fact traceable to the Scout defendants’ conduct that a favorable decision is likely to redress. See Lujan, 504 U.S. at 560-61, 112 S.Ct. 2130. The Barnes-Wallaces and the Breens submitted declarations asserting, without contradiction by the Scout defendants, that they used the parks and would like to use the facilities of the Scouts. They claim to have inferior access because their sexual orientation or agnostic beliefs precludes their becoming members. Such an “inability to unreservedly use public land suffices as [an] injury-in-faet.” Buono v. Norton, 371 F.3d 543, 547 (9th Cir.2004); see Separation of Church & State Committee v. City of Eugene, 93 F.3d 617, 619 n. 2 (9th Cir.1996) (per curiam) (finding standing because plaintiffs “alleged that the cross prevented them from freely using the area on and around” the location of the cross); Ellis v. City of La Mesa, 990 F.2d 1518, 1523 (9th Cir.1993) (explaining that “standing may be based on finding that the plaintiff has been injured due to his or her not being able to freely use public areas”).
We conclude that no rational trier of fact could find that the plaintiffs had access to the leased facilities that was equal to that enjoyed by Scout members. Even construing the facts favorably for the Scout defendants, the evidence shows they have preferential—and at times exclusive—use of the leased parklands.[4]
*1045 The Scout defendants contend that the plaintiffs would have been able to use the Camp Balboa facilities if they had applied. There are two overflow campsites, the Scouts state, and “[tjhere’s always someplace in Camp Balboa to ... fit somebody in.” [SER 624-25.] They claim its members “never use 100% of the available space at Camp Balboa” and that other facilities, such as the swimming pool, can be used during their camps. The Boy Scouts’ argument mistakenly assumes that access to Camp Balboa is equal because the campground is not closed for the Scouts’ exclusive use. The public’s access to the parkland is unequal because it is not on as favorable terms as that of the Boy Scouts.
The families also have unequal access to the Fiesta Island Aquatic Center. Again, the Boy Scouts mistakenly assumes that the public has equal access to the Aquatic Center because it is not completely closed to nonmembers. The Desert Pacific Council’s control of the reservations allows it to gain exclusive access to the most sought-after facilities.
Neither the Breens nor the Barnes-Wal-laces tried to gain access to Camp Balboa or the Aquatic Center, but this fact does not preclude standing. The families knew they would be subject to unequal or discriminatory treatment, and they did not have to subject themselves to such treatment to incur an injury. See Ne. Fl. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville, 508 U.S. 656, 666, 113 S.Ct. 2297, 124 L.Ed.2d 586 (1993); Bowman v. Block, 940 F.2d 1211, 1221 (9th Cir.1991). Their injury was the denial of equal treatment that resulted from a combination of the Boy Scouts’ exclusion of atheists, agnostics, and homosexuals and the Scouts’ preferential use of Camp Balboa and the Aquatic Center. See Ne. Fl. Chapter, 508 U.S. at 666, 113 S.Ct. 2297 (explaining that the injury is “the denial of equal treatment resulting from the imposition of the barrier”). Accordingly, they were not required to attempt to use the portions of the park the Desert Pacific Council exclusively occupies or to make a reservation during Scout camp. See Int’l Broth. of Teamsters v. United States, 431 U.S. 324, 365, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977) (stating that a discriminatory employment policy can deter “those who are aware of it” from applying for jobs).
3. The Families’ Alternative Theories of Standing
We reject the families’ other theories of standing. The Breens’ and the Barnes-Wallaces’ purposeful avoidance of the parklands leased by the Boy Scouts as a protest against the Scouts’ exclusionary policies is not a sufficient injury. We have held that people can suffer a direct injury from the need to avoid large religious displays, such as giant crosses or life-size biblical scenes. See, e.g., Buono, 371 F.3d at 549 (five to eight-foot-tall cross); SCSC, 93 F.3d at 619 (fifty-one-foot-tall cross); Ellis, 990 F.2d at 1520 (thirty-six-foot and forty-three-foot-tall crosses); Kreisner v. City of San Diego, 1 F.3d 775, 777 (9th Cir.1993) (ten by fourteen-foot displays containing life-size statuary of biblical scenes). But there are no displays in either Camp Balboa or the Aquatic Center that would be so overwhelmingly offensive that families who do not share the Scouts’ religious views must avoid them. See Val *1046 ley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc., 454 U.S. 464, 485, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982) (requiring the plaintiffs to show a personal injury suffered “as a consequence of the alleged constitutional error”) (emphasis omitted).
Nor have the families suffered a direct injury caused by the requirement that they pay a fee to the Desert Pacific Council to use Camp Balboa or Fiesta Island. It is undisputed that user fees are deposited into the Council’s general operating fund and therefore may be used for purposes other than the administration and upkeep of the parklands. Nonetheless, the families’ injury is “conjectural or hypothetical” because they never paid the fee to the Boy Scouts. Lujan, 504 U.S. at 560, 112 S.Ct. 2130 (citation omitted). Moreover, there is no showing that the fee conveys a net benefit to the Boy Scouts; on the contrary, the costs of maintaining the facilities exceed the user fees.
Finally, we disagree with the district court and conclude that the families do not have standing as municipal taxpayers because they have not suffered a “direct dollars-and-cents injury.” Doremus v. Bd. of Educ. of Hawthorne, 342 U.S. 429, 434, 72 S.Ct. 394, 96 L.Ed. 475 (1952). The families characterize the leases as tax expenditures, but the Supreme Court recently held that “state taxpayers have no standing under Article III to challenge ... state ... spending decisions simply by virtue of their status as taxpayers.” DaimlerChrysler Corp. v. Cuno, — U.S. —,—, 126 S.Ct. 1854, 1864, 164 L.Ed.2d 589 (2006).[5] The Court reasoned that the taxpayers lacked standing to challenge a state tax break, in part because it was unclear whether the tax breaks would “deplete the treasury” and thus cause the taxpayers to suffer an “actual or imminent” injury. Id. at 1862 (internal quotations omitted). This rationale applies equally to the municipal taxpayer challenge in this case. Cammack v. Waihee, 932 F.2d 765, 770 (9th Cir.1991). The families’ injury is not actual or imminent because it is unclear whether San Diego is expending tax dollars to support the leased property.
The leases are more reasonably characterized as a potential loss of municipal revenues, but even this loss is not particularized enough to create standing. There is no evidence that, if the leases were invalidated, the City would use the land to generate revenue. See id. at 1862 (finding the plaintiff taxpayers’ alleged injury too conjectural because it depended on legislators’ responses to the tax breaks). The City’s Director of Real Estate testified that “[t]he City would likely seek another lessee to operate a recreational facility ... under similar terms and conditions in the existing ... lease ... [because the] City Council has never had a policy of using the ... property in a manner that maximizes the revenue that potentially could be generated by this site.” [SER 4 ¶ 12.] Thus, the families have not suffered an injury to their poeketbook, as is necessary for taxpayer standing.
IV. Explanation of Certification
1. The Need to Avoid Federal Constitutional Questions
We are bound to resolve the families’ state constitutional claims before reaching their federal constitutional challenges. See Kuba v. 1-A Agric. Assoc., 387 F.3d 850, 856 (9th Cir.2004). If the *1047 California Constitution provides an independent basis for relief, then there is “no need for decision of the federal issue.” City of Mesquite v. Aladdin’s Castle, Inc., 455 U.S. 283, 295, 102 S.Ct. 1070, 71 L.Ed.2d 152 (1982). Yet any interpretation by this court of the State’s constitutional clauses, unlike an interpretation by the California Supreme Court, cannot be authoritative. See Spear v. Wells Fargo Bank, N.A., 130 F.3d 857, 861 (9th Cir.1997).
2. The Need for Certification
We certify three issues to the California Supreme Court because they require interpretation of the state constitution’s religion clauses beyond that found in state or federal cases. These clauses affect the delicate relationship between the government and religion, and any interpretation of these clauses has significant public policy ramifications.
a. The No Preference Clause
The No Preference Clause states in part that “[f]ree exercise and enjoyment of religion without discrimination or preference are guaranteed.” Cal. Const, art. 1 § 4. The California Supreme Court “has never had occasion to definitively construe” this clause. E. Bay Asian Local Dev. Corp. v. California, 24 Cal.4th 693, 719, 102 Cal.Rptr.2d 280, 13 P.3d 1122 (2000). Having not yet been faced with a case that requires it “to declare the scope and proper interpretation” of the clause, it has found no necessity to set the boundaries of the Clause. See Catholic Charities of Sacramento, Inc. v. Super. Ct., 32 Cal.4th 527, 562, 10 Cal.Rptr.3d 283, 85 P.3d 67 (2004). We therefore cannot accurately estimate from existing California Supreme Court cases how that Court would apply the No Preference Clause to the case before us. Nor can we with confidence look to federal caselaw interpreting the federal Free Exercise or Establishment Clauses, because those provisions are narrower than California’s clause. See Sands v. Morongo Unified Sch. Dist. 53 Cal.3d 863, 910, 281 Cal.Rptr. 34, 809 P.2d 809 (1991) (Mosk, J„ concurring) (stating that the No Preference Clause “is without parallel in the federal Constitution”); Vernon v. City of Los Angeles, 27 F.3d 1385, 1395 (9th Cir.1994) (noting that the California Constitution “prohibits any appearance that the government has allied itself with one specific religion” and that California courts have interpreted the No Preference Clause “as being broader than the Establishment Clause of the First Amendment”).
Although state intermediate appellate courts have construed the No Preference Clause, this case’s unique facts would require us to go beyond these decisions. See, e.g., Woodland Hills Homeowners Org. v. Los Angeles Cmty. Coll. Dist., 218 Cal.App.3d 79, 93-95, 266 Cal.Rptr. 767 (1990); Okrand v. City of Los Angeles, 207 Cal.App.3d 566, 571-72, 254 Cal.Rptr. 913 (1989); Bennett v. Livermore Unified Sch. Dist., 193 Cal.App.3d 1012, 1016, 238 Cal.Rptr. 819 (1987); Feminist Women’s Health Ctr., Inc. v. Philibosian, 157 Cal.App.3d 1076, 1092, 203 Cal.Rptr. 918 (1984). For example, the families challenge the process by which the leases were obtained, but no California court has identified the perspective from which we should scrutinize these processes to determine whether there has been a forbidden preference. The United States Supreme Court adopts the perspective of a reasonable observer when determining Establishment Clause questions, see County of Allegheny v. ACLU Greater Pittsburgh Chapter, 492 U.S. 573, 635, 109 S.Ct. 3086, 106 L.Ed.2d 472 (1989) (O’Connor, J., concurring in part and concurring in the judgment), but at least one Justice of the California Supreme Court has urged that *1048 courts interpreting the No Preference Clause “view the issue from the perspective of the minority,” see Sands, 53 Cal.3d at 915, 281 Cal.Rptr. 34, 809 P.2d 809 (Arabian, J., concurring). Thus, we seek certification so that the California Supreme Court, rather than this federal court, can chart the proper course through these unresolved areas.
b. The No Aid Clause
No controlling precedent exists in regard to the No Aid Clause either. This Clause prohibits the City from “mak[ing] an appropriation, or pay[ing] from any public fund whatever, or grant anything to or in aid of any religious sect, church, creed, or sectarian purpose.” Cal. Const, art. XVI § 5. To assess whether the leases violate the No Aid Clause, we must determine whether the leases are aid and, if so, whether the City supports a creed or sectarian purpose by granting the aid to the Boy Scouts. The California Supreme Court has not been called upon to define “aid” in a manner that applies to the circumstances of this case. Nor has it been required to establish what is a “creed” or “sectarian purpose” to which aid cannot be given.
The facts of this case also require us to go beyond the framework set forth in our own decision of Paulson v. City of San Diego, 294 F.3d 1124 (9th Cir.2002) (en banc), for interpreting the No Aid Clause. Paulson concerned a No Aid Clause challenge to a municipal government’s sale of public land containing a cross to a sectarian organization. Paulson concluded that the No Aid Clause “prohibits the government from (1) granting a benefit in any form (2) to any sectarian purpose (3) regardless of the government’s secular purpose (4) unless the benefit is properly characterized as indirect, remote, or incidental.” Id. at 1131. Whether the City granted a benefit to the Scout defendants for the advancement of a creed or sectarian purpose is a very different and more challenging question than that presented in Paulson. Resolution of this issue would require expanding our interpretation of California cases. An expansion or contraction of the definitions of “aid,” “creed,” or “sectarian purpose” could have a substantial impact upon Californians’ liberties. We are reluctant to embark on a refinement of the meaning of those terms without the authoritative assistance of the California Supreme Court. We thus ask that Court to exercise its discretion and decide whether the leases are aid and whether this aid benefits a creed or. sectarian purpose.
V. Administrative Information
The names and addresses of counsel for Lori, Lynn, and Mitchell Barnes-Wallace and Michael, Valerie, and Maxwell Breen are:
David Blair-Loy
Elvira Cacciavillani
ACLU Foundation of San Diego & Imperial Counties
P.O. Box 87131
San Diego, CA 92138-7131
Mark W. Danis
Morrison & Foerester, LLP
12531 High Bluff Drive Suite 100
San Diego, CA 92130-2040
M.E. Stephens
Stock Stephens, LLP
110 West C Street Suite 1810
San Diego, CA 92101
The names and addresses of counsel for Boy Scouts of America and the Desert Pacific Council, Boy Scouts of America are:
George A. Davidson
Carla A. Kerr
*1049 Hughes, Hubbard & Reed
1 Battery Park Plaza
New York, N.Y. 10004
Charles Avrith
Alicia Mew
Hughes, Hubbard & Reed
350 S. Grand Ave. 36th Floor
Los Angeles, CA 90071-3442
Scott H. Christensen
Hughes, Hubbard & Reed
1775 I Street, N.W.
Washington, DC 20006-5040
As required by California Rules of Court 29.8(c) and (d), the Clerk of this Court shall submit copies of all relevant briefs and an original and ten (10) copies of this Order to the Supreme Court of California with a certificate of service on the parties.
VI. Stay and Withdrawal from Submission
All further proceedings in this case in this court are stayed pending final action by the California Supreme Court.
This case is withdrawn from submission until further order of this court. The parties shall notify the Clerk of this Court within one week after the California Supreme Court accepts or rejects certification, and again within one week if that Court renders an opinion.

. For example, the Desert Pacific Council advertised camping dates for all of 2002 in its Winter 2001 newsletter. In October 2002, it had already reserved the campsites for its *1043 2003 summer camp. The 2001 reservation books show that the camp was closed during the Desert Pacific Council’s spring and summer camps. Diagonal slashes or an “x" covered the reservation books for these periods. The Council also reserved the entire campground for several days in February, March, and May 2001, and from December 31, 2001 to January 5, 2002. At one time the Desert Pacific Council informed non-Scout youth groups that they could make reservations not more than three months in advance and that the reservations would be accepted only if they did not conflict with “other scheduled Scouting functions."

. This Clause provides:
Free exercise and enjoyment of religion without discrimination or preference are guaranteed. This liberty of conscience does not excuse acts that are licentious or inconsistent with the peace or safety of the State. The Legislature shall make no law respecting the establishment of religion.
Cal. Const, art. I, sec. 4.

. This Clause states:
Neither the legislature, nor any county, city and county, township, school district, or other municipal corporation, shall ever make an appropriation, or pay from any public fund whatever, or grant anything to or in aid of any religious sect, church, creed, or sectarian purpose.
Cal. Const, art. XVI, sec. 5.

. For a detailed description of the Scouts' preferential use of the leased parklands, see supra pp. 1042-43.

. The district court did not have the benefit of DaimlerChrysler at the time it ruled that the plaintiffs had taxpayer standing. ■